DUNLAP et al., Appellees,

v.

W.L. LOGAN TRUCKING COMPANY et al., Appellants and Cross–Appellees;
Ohio Department of Transportation, Appellee and Cross–Appellant.

[Cite as *Dunlap v. W.L. Logan Trucking Co.*, 161 Ohio App.3d 51, 2005-Ohio-2386.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 03AP–463.

Decided May 17, 2005.

52

Lane, Alton & Horst, L.L.C., Jeffrey J. Jurca, and Monica L. Miller, for appellants and cross-appellees.

Jim Petro, Attorney General, and Peter E. DeMarco, for appellee and cross appellant.

French, Judge.

{¶ 1} Appellants, W.L. Logan Trucking Company ("Logan"), Norman Munnal, and their insurers, Great West Casualty Company ("Great West") and Gulf Insurance Group ("Gulf"), appeal from a judgment by the Ohio Court of Claims that determined that Munnal's and Logan's negligence was partly to blame for a truck collision in an Ashland County construction zone. The court also held that appellee, the Ohio Department of Transportation ("ODOT"), negligently planned and implemented a hazardous temporary road design that contributed to the accident. ODOT has filed a cross-appeal asserting that the court erred in finding ODOT partially liable and that, instead, Munnal's negligent driving was the proximate cause of the fatal accident that gave rise to this litigation.

{¶ 2} The accident occurred on U.S. Route 30 between Interstate 71 and Wooster, Ohio. In order to undertake four miles of road improvements on one side of the four-lane divided highway, ODOT developed a design whereby both eastbound lanes would be closed and traffic rerouted to one lane of the westbound portion of the road. ODOT used signage and double yellow lines of reflective tape to separate the two lanes of traffic, thus turning the four-lane divided highway into a two-lane, two-way operation ("TLTWO").

{¶ 3} On June 19, 1998, Munnal was driving a tractor-trailer on U.S. 30 in the scope of his employment as a driver for Logan. Munnal's truck left its lane of travel and drove into oncoming traffic, forcing David Dunlap's vehicle off the road and striking Reganne Heffelfinger's vehicle head-on. Although Dunlap and his passenger, Pamela Grimm, sustained minor injuries, Heffelfinger's injuries were fatal.

{¶ 4} Heffelfinger's estate and Dunlap and Grimm initiated two separate actions against Munnal and Logan in the Summit County Court of Common Pleas. Munnal and Logan responded with a third-party complaint against ODOT, which resulted in the consolidation of the separate actions and removal of the matter to the Ohio Court of Claims. Eventually, Munnal, Logan, and their insurers settled the Heffelfinger claim for $1.4 million, of which Logan paid a $10,000 deductible. The Dunlap and Grimm claims were eventually settled for $7,500. The parties stipulated that the Heffelfinger, Dunlap, and Grimm settlements extinguished any potential liability of ODOT to Heffelfinger's estate or to Dunlap and Grimm. Thus, the only remaining claim to be tried before the Court of Claims was appellants' third-party action against ODOT for reimbursement of the insurance sums paid to Dunlap, Grimm, and the Heffelfinger estate. This action rested on the assertion that ODOT was at least partially liable for negligently designing and maintaining a hazardous road condition.

{¶ 5} In its April 2003 decision, the Court of Claims addressed the issue of ODOT's negligence. The court held:

After considering the totality of the circumstances, the evidence adduced at trial, and the relevant case law, the court finds that ODOT breached its duty to the traveling public by failing to keep the roadway free from an unreasonable risk of harm to motorists. While ODOT considered a variety of designs which called for the use of channelizing devices, it eventually decided not to implement any of them. The court finds that defendant failed to utilize some method to physically separate adjacent lanes of travel which thereby created an unreasonable risk of harm to motorists utilizing the roadways. The court further finds that such negligence was a proximate cause of the accident.

{¶ 6} The court additionally determined that Munnal had failed to sustain his burden of proof regarding his claimed defense of having been suddenly stricken

by a period of unconsciousness. Instead, the court determined that Munnal knew or should have known that he had a propensity to fall asleep at unpredictable times:

> This court is convinced that whether or not Munnal was aware that he suffered from sleep apnea, he was certainly aware that he had repeatedly experienced episodes of excessive sleepiness which, standing alone, would seem to this court to be an unsafe state for any commercial truck driver.

{¶ 7} Concluding that the doctrine of respondeat superior rendered Logan liable for Munnal's negligence, the court determined that Logan should receive contribution from ODOT and reduced damages by 50 percent to account for Logan's own negligence. The court thus determined that ODOT owed Logan $5,025, which was one-half of the $10,000 deductible plus Logan's filing fee.

{¶ 8} An additional issue before the court involved ODOT's argument that sovereign immunity precluded Logan and Munnal from recovering from ODOT any money paid on their behalf by Great West and Gulf. The court found:

> Under R.C. 2743.02(D) and *Community Ins. [Co. v. Ohio Dept. of Transp.* (2001), 92 Ohio St.3d 376, 750 N.E.2d 573]*, Logan and Munnal's recovery in this contribution action against the state must be reduced, as a matter of law, by the insurance proceeds paid on their behalf. Such a ruling is consistent with the legislative intent to preserve public funds while providing reimbursement for an uninsured claimant.

However, with regard to the $10,000 payment made by Logan, R.C. 2743.02(D) does not apply. See *Heritage Ins. Co. v. Dept. of Transp.* (July 10, 2002), Franklin Ct. of Cl. No. 99–01250.[1]

{¶ 9} Appellants now assign the following as error:

1. The Court of Claims erred in concluding that Great West and Gulf were not entitled to recover against ODOT for its proportionate share for the settlements paid to the plaintiffs.

2. The Court of Claims erred in concluding that W.L. Logan and Norman Munnal were contributorily negligent.

{¶ 10} ODOT's cross-appeal assigns the following as error:

Cross–Assignment of Error No. 1:

The trial court erred by failing to find that ODOT was immune from liability in making a discretionary decision on whether to use a channelizing device.

Cross–Assignment of Error No. 2:

---

1. This court reversed and remanded the Court of Claims' decision in *Heritage,* and the Ohio Supreme Court has recently affirmed our decision. *Heritage Ins. Co. v. Ohio Dept. of Transp.,* 104 Ohio St.3d 513, 2004-Ohio-6766, 820 N.E.2d 871.

The trial court erred in finding that ODOT negligently maintained the roadway and that it was not reasonably safe for the traveling public.

Cross–Assignment of Error No. 3:

The trial court erred for failing to find that W.L. Logan is liable for negligent hiring and entrustment.

Cross–Assignment of Error No. 4

The trial court erred by using the wrong legal standard to weigh the evidence and failed to properly apportion negligence between all parties.

{¶ 11} We will address ODOT's first and second assignments of error on cross-appeal first, as they both involve the threshold question of ODOT's liability. As we explain below, we sustain ODOT's first and second cross-assignments of error and, on these grounds, reverse the decision of the trial court.

{¶ 12} In 1975, the state of Ohio enacted R.C. 2743.02, which provides, with certain exceptions, "The state hereby waives its immunity from liability * * * and consents to be sued, and have its liability determined * * * in accordance with the same rules of law applicable to suits between private parties * * *." R.C. 2743.02(A)(1). In *Reynolds v. State* (1984), 14 Ohio St.3d 68, 14 OBR 506, 471 N.E.2d 776, at paragraph one of the syllabus, however, the Supreme Court of Ohio held that the state's consent to be sued preserved the state's immunity "for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." Accordingly, with respect to actions of ODOT, Ohio courts have since held: "The issue of whether an act constitutes a mandatory duty or a discretionary act determines the scope of the state's liability because ODOT is immune from liability for damages resulting from not performing a discretionary act." *Gregory v. Ohio Dept. of Transp.* (1995), 107 Ohio App.3d 30, 33–34, 667 N.E.2d 1009, citing *Winwood v. Dayton* (1988), 37 Ohio St.3d 282, 525 N.E.2d 808; accord *Garland v. Ohio Dept. of Transp.* (1990), 48 Ohio St.3d 10, 548 N.E.2d 233, paragraph one of the syllabus.

{¶ 13} Further, while acknowledging the state's immunity for discretionary decision making, the Ohio Supreme Court has held that once the state makes such a basic policy decision and the state decides to engage in a certain activity or function, "the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities." *Reynolds,* 14 Ohio St.3d 68, 14 OBR 506, 471 N.E.2d 776, at paragraph one of the syllabus. Thus, although ODOT is immune from suit for decisions characterized by the exercise of engineering judgment or discretion, once ODOT decides to use a particular traffic control device, it may be

held liable for negligence in implementing its plans. See id.; *Cushman v. Ohio Dept. of Transp.* (Mar. 14, 1996), Franklin App. No. 95API07–844, 1996 WL 117234. To prove actionable negligence against ODOT, a plaintiff must demonstrate that ODOT owed a duty to the plaintiff, ODOT breached its duty, and the breach proximately caused the plaintiff's injuries. Id.

■ {¶ 14} With these principles as our guide, we look first to whether ODOT's actions at issue in this case were discretionary. In its decision, the trial court determined, as a matter of law, that ODOT was required to refer to the Ohio Manual of Uniform Traffic Control Devices ("MUTCD") in designing the methods to be used to reroute traffic during the construction project. Appellants assert that because U.S. 30 qualified as a freeway and the project was partially financed with federal funds, the corresponding federal manual, which expressly required the use of concrete barriers to separate lanes of traffic, controlled. We agree with the trial court that the MUTCD was the pertinent guide. As the Supreme Court recognized in *White v. Ohio Dept. of Transp.* (1990), 56 Ohio St.3d 39, 41, 564 N.E.2d 462: "The Ohio Manual of Uniform Traffic Control Devices for Streets and Highways * * * has been adopted as the state's official specifications for highway signs and markings pursuant to the mandate of R.C. 4511.09." See, also, *Roadway Express, Inc. v. Ohio Dept. of Transp.* (June 28, 2001), Franklin App. No. 00AP–1119, 2001 WL 721988.

{¶ 15} Former Section 1D of the MUTCD reads:

The decision to use a particular device at a particular location should be made on the basis of an engineering study of the location. Thus, while this Manual provides standards for design and application of traffic control devices, the Manual is not a substitute for engineering judgment. Except for sections of this Manual that mandate the installation of a traffic control device, it is the intent that the provisions of this Manual be standards for traffic control device installation, but not a requirement of installation. Qualified engineers are needed to exercise the engineering judgment inherent in the selection of traffic control devices, just as they are needed to locate and design the roads and streets which the devices complement.

■ {¶ 16} Where ODOT chooses to act, it is under a duty to conform to requirements in the MUTCD; however, the manual leaves some decisions up to the reasonable engineering judgment of ODOT's agents. *Perkins v. Ohio Dept. of Transp.* (1989), 65 Ohio App.3d 487, 584 N.E.2d 794. The key to determining what type of decision is discretionary is the manual's use of the word "should" rather than "shall." Id. Thus, while the word "shall" establishes a mandatory duty, the word "should" requires ODOT to use its discretion and engineering judgment. See *Jeska v. Ohio Dept. of Transp.* (Sept. 16, 1999), Franklin App. No. 98AP–1402, 1999 WL 717320. When the manual does not prescribe the duty,

or standard of care, the proper standard is that of a reasonable engineer using accepted practices at the time. *Madunicky v. Ohio Dept. of Transp.* (1996), 109 Ohio App.3d 418, 421, 672 N.E.2d 253, citing *Lunar v. Ohio Dept. of Transp.* (1989), 61 Ohio App.3d 143, 147, 572 N.E.2d 208.

{¶ 17} Here, ODOT chose to use double yellow lines, rather than concrete barriers, to channel traffic. Regarding that decision, former MUTCD, 7F–12.1 stated: "Barriers may serve an additional function of channelizing traffic; however, their use should be determined by engineering analysis and the protective requirements of the location, not the channelizing needs." As detailed below, the evidence shows that ODOT carefully considered its options and then chose the channelizing device most likely to minimize risks to motorists using U.S. 30, recognizing that no option was completely risk-free.

{¶ 18} Michael Weiler, ODOT production administrator for the District 3 office in Ashland, testified that U.S. 30 in this area is an expressway and that ODOT had only two options for channelizing traffic through this construction zone: a concrete barrier or the yellow reflective tape. He said the difference between an expressway and a freeway is that an expressway has direct access from the side, intersecting at-grade roadways, and a 60 m.p.h. versus a 65 m.p.h. posted speed limit. Weiler testified that the big consideration on this project was the high volume of truck traffic, which made it crucial to maintain sight distances at intersections.

{¶ 19} Tom Culp, ODOT's plan-preparation manager, supervised the design team involved with the U.S. 30 project, working within the guidelines given him by Weiler, the requirements of the Location and Design Manual, Standard Drawings and Application Standards, and the MUTCD. He stated that while the federal manual is used on occasion, ODOT did not use it here. Disagreeing with Weiler's assessment of U.S. 30 as an expressway, Culp stated that this road was not an expressway or a freeway, but a four-lane divided highway with all at-grade intersections. He indicated that concrete barriers were not an option because of the at-grade intersections. The problem, as Culp outlined it, is that people driving with concrete barriers do not expect traffic to be crossing in front of them at intersections and that they cannot see and will not slow down for vehicles entering the intersection. This problem, combined with the inability of drivers approaching from the side to see oncoming traffic on U.S. 30, made concrete barriers a poor choice. Culp stated that he also rejected the use of plastic pylons to separate lanes of traffic on U.S. 30 because they also can present sight-distance problems, because they are not effective in preventing lane changes, and because when they break, they are difficult to replace while still maintaining traffic flow.

{¶ 20} Christopher Runyan, who was at the time ODOT's assistant director for transportation policy, assisted in the planning of the U.S. 30 construction project. He stated that concrete barriers would have impeded the goal of maintaining a safe traffic situation and that although they would have mitigated certain types of accidents, their use had a negative side that outweighed the positives. The following exchange took place:

Q. You, in fact, were recommending using double yellow lines. Did you believe that that was safe?

A. Yes, I did.

Q. And why is that?

A. The double yellow lines delineated the traffic. I believe that there are tens of thousands of miles of two-lane highway that are effectively delineated and are traveled safely by trucks and cars every day * * *. So I felt that because of those reasons it would be a safe application.

* * *

A. Obviously, concrete barriers being a solid obstruction also obstructs sight distance.

* * *

Q. We talked about the balancing of the safety of the public with the convenience to the travelers and you also talked about the options that could apply. Tell me about how you weighed the options and did that balancing in this case.

A. Well, again, based on the limited information that was available here, I looked at the ADT count, the average daily traffic, which was 12,600. I knew that a two-lane facility could handle that type of volume of traffic. I knew that a two-lane configuration, again, was used all over the state and is safely traversed by all different types of vehicles. I knew that to provide access through and around the construction zone there would be a desire for people to continue to want to use the side roads. And we had, I believe, an effective way to allow that to continue to happen and still have a safe facility out there.

* * *

A. * * * And by not providing that sight distance, if concrete barriers were in place, would be a hazard. If we kept the side roads open.

{¶ 21} To contradict ODOT's opinion, appellants presented expert testimony by Al Klais, a civil engineer from a Wisconsin safety-engineering consulting firm. Klais opined that because this was a federally funded construction project, ODOT was required to use the federal manual in rendering its design and, therefore, ODOT had to use concrete barriers. In response to ODOT's evidence regarding sight distances at the intersections, Klais testified that there was 1,200 feet of

sight distance without any barriers and that drivers would need at least 700 feet of sight distance for a 50 m.p.h. roadway. By Klais's calculations, concrete barriers would have reduced the sight distance below 700 feet at only one intersection. Klais's solution to that problem would have been to hold the barrier back on the approach to the intersection and use pylons in the intersection and up to the start of the barrier. Klais further testified that even if the MUTCD controlled this project, ODOT lacked a good reason to avoid concrete barriers:

[T]he safety considerations for—and the requirements for installing channelizing devices and barrier on this expressway, are far more important than—than the need to keep these intersections open, especially given the availability of alternate routes in close proximity.

{¶ 22} As we have previously held, however, it is not our role or that of the trial court to second-guess ODOT's discretionary choice of one reasonable option over another. In *Pottenger v. Ohio Dept. of Transp.* (Dec. 7, 1989), Franklin App. No. 88AP–832, 1989 WL 147998, this court addressed a case in which the plaintiff argued that ODOT had negligently designed an intersection. Affirming the Court of Claims' conclusion that ODOT was immune because it was exercising its discretionary, planning-type function, this court stated:

In the present case, it is true that defendant had several available options which could have been utilized to diminish the possibility of accident of which defendant chose one. Perhaps the implementation of one of the other options would have prevented the accident in this case. However, we will not impose liability upon defendant in exercising its discretion to select one available reasonable option over another.

Id., relying, in part, on *Winwood.* Thus, despite the preference of appellants' expert, it was within ODOT's discretion to determine the best alternative.

{¶ 23} Finally, despite appellants' expert's testimony to the contrary, at least one ODOT official testified that the federal manual did not control Ohio projects. And more important, not only did ODOT's constructability committee review and approve the project plans, the Federal Highway Administration approved them as well.

{¶ 24} In short, under the MUTCD, the choice of a channelizing device was a discretionary decision, which ODOT made after significant consideration of the competing risks and benefits. Therefore, ODOT is immune from liability arising from its discretionary decision to use double yellow lines, instead of any other device, to channel traffic through this construction zone. On these grounds, we sustain ODOT's first assignment of error on its cross-appeal.

■ {¶ 25} We turn now to ODOT's second cross-assignment of error, and to ODOT's implementation of its design, to determine whether ODOT was negligent.

As noted, to prove actionable negligence against ODOT, a plaintiff must demonstrate that ODOT owed a duty to the plaintiff, ODOT breached its duty, and the breach proximately caused the plaintiff's injuries. *Cushman*, Franklin App. No. 95API07–844. ODOT has a duty to maintain its roadways in a reasonably safe condition for the motoring public; however, ODOT is not an insurer of the safety of its roadways. *Leskovac v. Ohio Dept. of Transp.* (1990), 71 Ohio App.3d 22, 26–27, 593 N.E.2d 9; *Knickel v. Dept. of Transp.* (1976), 49 Ohio App.2d 335, 339, 3 O.O.3d 413, 361 N.E.2d 486.

{¶ 26} According to the trial court, ODOT created an unreasonable risk of harm to motorists because, "despite having a high-speed, high-volume TLTWO, ODOT chose to forgo the use of any channelizing device and elected to rely on yellow reflective tape, reduced speed, and signage." The court additionally stated:

> While ODOT considered a variety of designs which called for the use of channelizing devices, it eventually decided not to implement any of them. The court finds that defendant failed to utilize some method to physically separate adjacent lanes of travel which thereby created an unreasonable risk of harm to motorists utilizing the roadways.

The court finally concluded: "ODOT's failure to utilize a channelizing device effectively eliminated the errant driver's last opportunity to realize that he must remain in his lane of travel."

{¶ 27} We disagree with the court's conclusion that ODOT used *no* channelizing devices. As one ODOT witness testified:

A. A channelizing device is anything that gives guidance to a driver of a vehicle to keep them within prescribed boundaries.

\* \* \*

A. A yellow line is a channelizing device. A white line is a channelizing device.

\* \* \*

A. Because they outline boundaries.

Neither the Ohio Revised Code nor the Ohio Administrative Code defines the term "channelizing device." Nor does the former version of the MUTCD, but it does refer to several types of devices that may be used in channeling traffic. The following statements from the MUTCD suggest that the phrase "channelizing device" includes yellow reflective tape used in conjunction with signage and speed reduction:

**7F–1 Function**

The functions of barricades and channelizing devices are to warn and alert drivers of hazards created by construction or maintenance activities in or near traveled way, and to guide and direct drivers safely past the hazards.

In fulfilling these two functions, barricades and channelizing devices are often required to satisfy two opposing requirements. For example, a channelization installation should be constructed in a substantial manner to provide protection for men working in the roadway. At the same time, however, the channelization devices should provide a smooth and gradual transition which reduces the width of the traveled way, and in this case the channelizing devices should not inflict any severe damage to a vehicle that inadvertently strikes them. The objective should be the development of a traffic control plan which uses a variety of traffic control measures in whatever combination necessary to assure smooth, safe vehicular movement past the work area and at the same time provides maximum safety for the equipment and the workmen on the job.
\* \* \*

### 7F–5 Cone Design

Included under this heading are a group of devices whose primary function is the channelization of traffic. \* \* \*
\* \* \*

### 7F–7 Drum Design

Drums used for traffic warning or channelization shall be approximately 36" in height and a minimum of 18" in diameter. \* \* \*
\* \* \*

### 7F–9 Vertical Panel Design

Vertical panels used as channelizing or warning devices shall be 8 to 12 inches in width and a minimum of 24 inches in height. \* \* \*
\* \* \*

### 7F–11 Delineator Application

As used herein, delineators mean all types of reflector units that are capable of reflecting light from either the upper or lower beam of automobile headlamps. Their usefulness in construction and maintenance zones is one of guidance rather than one of warning. \* \* \*
\* \* \*

### 7F–12.1 Portable Barrier–Design and Application

Barriers are highway appurtenances designed to prevent vehicular penetration from the travelway to areas behind the barrier such as to minimize damage to impacting vehicles and their occupants. They may also be used to separate two-way traffic.

\* \* \*

Barriers may serve an additional function of channelizing traffic; however, their use should be determined by engineering analysis and the protective requirements of the location, not the channelizing needs. \* \* \*

\* \* \*

### 7F–18   Temporary Channelization Devices

Cones, drums, and barricades may be used to funnel traffic into the appropriate lane.  Cones may be used under urban conditions and on minor state routes or for less than one day setups.  Drums should be used on freeway type facilities, particularly for over night set-ups.

{¶ 28} Our reading of these excerpts suggests that "channelizing device" does not mean one particular type of device but instead includes cones, drums, barricades, vertical panels, painted lines, and reflective tape.  In fact, sections 7F–1 and 7F–12.1 suggest that a barricade and a channelizing device are not one and the same and that while barricades may be used as a channelizing device, they are not the only option available to "warn and alert drivers of hazards created by construction."

{¶ 29} In light of both the depositional evidence and the contents of the MUTCD, the trial court's conclusion that ODOT chose to use no channelizing device whatsoever is erroneous, since the yellow reflective tape was, in fact, a channelizing device.

■■ {¶ 30} As we consider whether ODOT breached its duty to the public, we must take into account that this was a construction zone.  As we have indicated on several occasions, ODOT cannot guarantee the same level of safety during a highway construction project as it can under normal traffic conditions. *Feichtner v. Ohio Dept. of Transp.* (1995), 114 Ohio App.3d 346, 354, 683 N.E.2d 112; *Roadway Express, Inc.* The test is whether, under the totality of the circumstances, "ODOT acted sufficiently to render the highway reasonably safe for the traveling public during the construction project." *Basilone v. Ohio Dept. of Transp.* (Feb. 13, 2001), Franklin App. No. 00AP–811, 2001 WL 118602, citing *Feichtner,* and *Lumbermens Mut. Cas. Co. v. Ohio Dept. of Transp.* (1988), 49 Ohio App.3d 129, 551 N.E.2d 215.  In our view, the evidence shows that ODOT acted appropriately to render this construction zone reasonably safe.

{¶ 31} First, there was evidence concerning the implementation of the double yellow lines to channel traffic.  Culp testified:

A.   We wanted to make sure that we had the best center line that was possible, so we chose to use a manufactured tape that's very bright in daytime and has highly reflective beads on it so that it would be very visible at night. So it was the best material that we could find for the center line.

Q. Did you think that that was a reasonably safe option?

A. Yes, I did.

Q. And why did you think that?

A. Well, because of the character of the roadway along U.S. 30 and the fact that drivers are expecting different types of roadway on that section, because it was consistent from one end to the other. In other words, once we crossed drivers over in the two-lane section, then it would stay two-lane until they got out of the construction zone. We wouldn't be popping back and forth between a section that had barrier or didn't have barrier.

The intersections were unobstructed, as far as sight distance was concerned, and we installed a system of warning and regulatory signs to tell drivers that they were not to pass, and that we—we would give them indication that there would be two-way traffic, and instructions at the intersections and the side road approaches to the intersections that we'd changed the character of the roadway.

{¶ 32} By using the double yellow lines, ODOT made this construction zone similar to other two-lane rural roadways in Ohio with similar traffic volume. Those two-lane roadways include portions of U.S. 30 that are permanently configured as two-lane roadways—including roadways Munnal drove just prior to the accident.

{¶ 33} Second, there was significant testimony about the signage ODOT implemented, including notification of a change in the speed limit. Culp testified about the signage a driver would have encountered as he or she approached the construction zone:

A. As you approach the project going westbound on U.S. 30, we had a—an informational sign that said "Road Construction Next Five Miles," then a series of signs to close the left lane of U.S. 30. There was a "Left Lane Closed Ahead," and there was a sign on each side of the westbound lanes, another sign that said—and these were warning signs—another sign that said, "Watch For Stopped Traffic," another pair of signs that said "Road Construction Ahead One Mile," another pair of signs that said, "Left Lane Closed Ahead." Those were all warning signs.

Then there was a "Do Not Pass" sign, which is a regulatory sign. And then a "50 Mile Per Hour Speed Limit" sign.

{¶ 34} Trooper Michael Vinson, who investigated the crash, testified that as part of his accident report, he drove the portion of the construction zone Munnal had driven just prior to the accident and documented the posted signs and warnings in that stretch of roadway. He testified:

A. The crash occurred in a construction zone. The investigation of the crash revealed that the vehicle, which was a semi that was traveling westbound, traveled completely left of center, striking the other vehicle that was coming eastbound head-on.

Since it was a construction zone and the severity of the crash, I thought it best to go back through and—and document all the signs and warnings that were there for the traffic on westbound 30 to indicate that it went from a four-lane divided highway to a two-lane non-divided highway.

Q. Okay. And so this list of 21—I think there's about 21 items on here. Those are things that you actually observed at the scene?

A. That's correct. What I did is * * * I went back through * * * and proceeded in a westbound fashion as the driver that was driving the semi would have been, and I documented with photographs, and then also wrote on this what we call an OH–2, a supplement form, all the signs and what they were.

{¶ 35} Trooper Vinson also testified regarding the visibility of those signs on the day of the crash:

Q. And you mentioned it was a clear day. Did you notice any problems with visibility as you went to the crash site?

A. No, it was * * * almost a perfect summer evening. It was warm. There was—you know, there wasn't—it wasn't overcast. It was sunny. No rain, fog, or anything like that. It was a clear evening.

{¶ 36} When asked specifically about four signs giving notice of the change in traffic flow, Trooper Vinson testified that "all the signs were clearly visible from the road."

{¶ 37} David Dunlap testified that on the day of the accident, he observed signage that alerted him to the construction zone, and he testified that the signage did not confuse him. Dunlap also testified that the day before the accident, he had driven west through the construction zone, that is, the same direction and route Munnal traveled on the day of the accident. He testified that on that day as he traveled west, he saw no one passing; he saw no one go left of center; and he had no trouble staying on the roadway. In fact, even Munnal testified that he understood what similar roadway signs mean and that they are not confusing to him.

{¶ 38} Appellants' own expert, Al Klais, admitted that the double yellow lines and signs were all visible, that they were clues to a driver not to go left of center, and that they should not have been ignored. He also admitted that such pavement markings are commonly used on the nation's roadways and that he has designed roads using them.

{¶ 39} There was evidence that drivers were passing in the construction zone despite the "No Passing" signage. However, it did not appear from the evidence that ODOT was aware of that issue before the accident occurred, and in any event, upon learning of the passing problem, ODOT asked the Ohio State Highway Patrol for increased enforcement to minimize passing within the zone.

{¶ 40} There also was evidence that other accidents had occurred in the construction zone. Specifically, accidents occurred at intersections, and one other head-on collision occurred after the accident at issue here. But even given the evidence concerning these accidents, ODOT officials still considered the construction zone to have been "reasonably safe" for the traveling public.

{¶ 41} Culp testified:

So we try and balance the risks to the people on the highway itself * * * with the risk of how do the people trying to get across U.S. 30 make that maneuver safely, and we picked the best options available to us for the project, and it turned out to be reasonably safe.

We had 12,000 people a day driving through that project on U.S. 30, in addition to those crossing the roadway, and they did a * * * reasonably good job of negotiating that roadway.

{¶ 42} Admittedly, we cannot say with certainty whether any additional or alternate safety devices would have prevented the accident at issue here, or whether those devices would have caused additional or different problems. We can say, however, that a reasonable and alert driver could have driven—and on a daily basis thousands of drivers did drive—through this construction zone safely. Given the reflective, double yellow lines, the reduced speed, the high number of clearly visible signs (including the 21 signs Munnal passed just prior to the accident) to alert drivers to the construction and to the change in traffic conditions, and the lack of evidence showing that the number of accidents or other incidents within the zone was unusual or unreasonably high, we find that ODOT acted sufficiently to render the roadway reasonably safe for the traveling public during the construction project. Therefore, we find that ODOT was not negligent in its implementation of the construction project, and we sustain ODOT's second cross-assignment of error.

{¶ 43} Appellants' second assignment of error asserts that the trial court erred in finding Logan and Munnal contributorily negligent because the evidence supported a finding that Munnal's sudden unconsciousness caused the truck to move left of center, and Munnal cannot be liable for losing control under these circumstances.

{¶ 44} The Ohio Supreme Court has recognized a sudden-medical-emergency defense, which holds that a driver suddenly stricken by an unantic-

ipated period of unconsciousness is not chargeable with negligence for losing control of his vehicle. *Roman v. Estate of Gobbo,* 99 Ohio St.3d 260, 2003-Ohio-3655, 791 N.E.2d 422, reaffirming *Lehman v. Haynam* (1956), 164 Ohio St. 595, 59 O.O. 5, 133 N.E.2d 97. To qualify for the defense, the defendant must prove by a preponderance of the evidence that he had no reason to anticipate or foresee the sudden loss of consciousness. *Lehman,* 165 Ohio St. at 600, 59 O.O. 5, 133 N.E.2d 97.

{¶ 45} Addressing the evidence presented at trial, the Court of Claims determined that Munnal failed to sustain his burden of proof regarding the defense of sudden medical emergency. The court specifically stated:

Munnal knew or should have known that over the course of his adult life, he had a propensity to fall asleep at unpredictable times; e.g., when standing up and leaning against a wall, while playing cards, or while conversing at parties. Although Munnal insisted at trial that prior to the accident he had slept well at night and that he usually slept eight hours per night, his fiancée, Christine Natale, testified that Munnal slept poorly; that he was restless and jerky while sleeping; and that he slept, on average, only three hours per night. While Munnal testified that he knew when he was tired and that he often needed to pull over and rest for a few hours before he could proceed on his route, he also acknowledged that on at least one occasion he had fallen asleep while driving, only to wake up after his vehicle had gone off the road onto the berm.

{¶ 46} Disputing this view of the evidence, appellants direct us to the deposition testimony of Robert W. Clark, M.D., a sleep-disorder specialist who evaluated Munnal after the accident. Clark testified that his examination of Munnal indicated that Munnal had a heavy body build, elevated blood pressure, and nasal congestion, and that he was sleepy and lethargic, all common characteristics of someone with sleep apnea. He recommended that Munnal spend the night at the sleep clinic for observation. As a result of his evaluation, Clark diagnosed Munnal with severe obstructive sleep apnea, a serious illness that Clark confirmed can lead to stroke and/or death. Clark testified that many sleep-apnea sufferers engage in automatic behavior during which they can be conducting tasks such as driving while unconscious and that many sufferers do not even realize they have a problem. Clark opined that at the time of the accident, Munnal was unconscious: not "blacked out," like someone who has fainted, but, rather, engaged in automatic behavior. One of the signs of this, Clark stated, was that Munnal said he did not remember anything about the time period surrounding the accident. Clark stated that distance truck-driving was not the right profession for someone with untreated sleep apnea.

{¶ 47} Munnal himself testified that prior to the accident, he did not know he had sleep apnea, although he had seen a doctor in November 1997 for dizzy

spells. At that time, he underwent tests that resulted in a diagnosis of a bleeding ulcer and migraine headaches, for which he was on medication. His physician, Barry E. Marged, M.D., testified that a follow-up visit after Munnal had been on the medication showed that he was "90 percent improved" with no more dizziness. Marged testified that Munnal did not give a history of any sleep disorder and that people with sleep apnea often are unaware of any problems. Another doctor, Kevin Mikesell, D.O., testified that he examined Munnal in the emergency room after the accident and that Munnal had reported to him that he had had a coughing spell after which he briefly lost vision and that Munnal had given a history of dizziness.

{¶ 48} According to appellants, this physician testimony all pointed toward a finding that Munnal was not aware of his condition prior to the accident and thus had no reason to anticipate that he would lose consciousness while driving. Appellants specifically object to the court's apparent reliance upon testimony by Christine Natale that Munnal had previously exhibited signs of sleep apnea because, according to appellants, her testimony does not indicate that she communicated her suspicions to Munnal.

{¶ 49} Regardless of exactly what the diagnosis was, and regardless of whether Munnal specifically knew that he had sleep apnea, the record does indicate that Munnal knew he had some sort of health problem that could interfere with his safe operation of a truck. In November 1997, he was having trouble with dizziness, and Marged testified that he told Munnal not to drive until the problem was resolved. In the questionnaire Munnal completed prior to visiting Clark, Munnal answered yes to the question "Do you have trouble staying awake and alert?"

{¶ 50} He then checked the following boxes as applying to him: "Constantly fatigued," "Sleepy on night shift," "Pull off road to nap," "Others say I'm too sleepy," "Feel alert but fall asleep without warning," "Take naps but am still sleepy," "Fall asleep only if inactive," "Should pull off road to nap but don't," "Others accuse me of falling asleep when I didn't think I did." Even considering that some of these answers may have been influenced by the fact that Munnal was filling out the questionnaire after the accident, some of the answers clearly indicate that he had had a problem with fatigue and sleepiness for some time prior to the accident. Other parts of the questionnaire indicate that Munnal would stay home to sleep rather than attend social events and that he had fallen asleep while standing, talking, taking tests, or attending movies and parties. During Natale's testimony, the following exchange occurred:

Q. So he knew when he was tired?

A. Uh-huh. Yes.

Q. Sometimes, though, you had to tell him—sometimes he would fall asleep and you'd see him sleeping and he wouldn't believe you when you told him he was sleeping, right?

A. Yes.

Q. What would he tell you?

A. "I'm not sleeping, I've just got my eyes closed."

Q. All right.

A. But he'd be sleeping.

Q. And in those instances, you would tell him he was sleeping and he wouldn't believe you?

A. Uh-huh. Yes.

{¶ 51} Based upon the contents of the questionnaire and Natale's testimony, the trial court justifiably concluded that, despite the fact that Munnal's sleep apnea was not specifically diagnosed until after the accident, Munnal was aware of excessive fatigue and aware of falling asleep at inopportune or unusual moments prior to the accident. Thus, the court did not err in concluding that Munnal failed to prove by a preponderance of the evidence that his loss of consciousness was not foreseeable, and so Munnal did not qualify for the sudden-medical-emergency defense.

{¶ 52} Because we find that Munnal was responsible for his conduct and could be found negligent for failing to operate his truck in a safe manner, we also conclude that the trial court properly held Logan responsible for Munnal's acts while in the scope of his employment. With regard to this issue, the trial court stated:

> In the instant case, it is undisputed that when Munnal traveled left of center he was driving a tractor-trailer for Logan in the ordinary course of business. Since Munnal's negligence is not excused, Logan is necessarily liable for the acts of its employee.

{¶ 53} Thus, we overrule appellants' second assignment of error.

{¶ 54} ODOT's third assignment of error on cross-appeal claims that the trial court erred in failing to find Logan liable for negligent hiring and entrustment. The trial court's decision does not discuss this issue, and we have no indication that the court even considered it. ODOT concedes that if we reverse the trial court on the issue of ODOT's contributory negligence, we need not reach the issue of Logan's liability for negligent hiring and entrustment. Given our conclusion that ODOT is not liable and the fact that the trial court never addressed this claim, we overrule this cross-assignment of error as moot.

{¶ 55} Appellants' first assignment of error asserts that the trial court erred in finding that the two insurers could not recover ODOT's proportionate share of the settlements paid to appellants. Because ODOT was not liable, the insurers are not entitled to reimbursement from ODOT, and so we overrule as moot appellants' first assignment of error.

{¶ 56} ODOT's fourth assignment of error on cross-appeal alleges that the court erred in using the wrong legal standard in weighing the evidence and apportioning negligence among the parties. Given our disposition of all other assignments of error, we find it unnecessary to reach this question, and so we overrule ODOT's fourth cross-assignment of error as moot.

{¶ 57} Based upon these considerations, appellants' first assignment of error is overruled as moot, appellants' second assignment of error is overruled, ODOT's first and second assignments of error on cross-appeal are sustained, ODOT's third and fourth assignments of error on cross-appeal are overruled as moot, and the judgment of the Ohio Court of Claims is affirmed in part and reversed in part, and the cause is remanded with instructions to enter judgment in accordance with the opinion rendered herein.

> Judgment affirmed in part
> and reversed in part,
> and cause remanded.

BROWN, P.J., and LAZARUS, J., concur.