NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

21-P-740                                          Appeals Court

        SHAUNTOO COTTRELL  vs.  EDWARD LAIDLEY & another.[1]


                        No. 21-P-740.

     Middlesex.     July 17, 2023. - October 18, 2023.

          Present:  Green, C.J., Ditkoff, & Hodgens, JJ.



Negligence, Motor vehicle, Foreseeability of harm, Expert
     opinion, Employer, Vicarious liability.  Practice, Civil,
     Summary judgment.



     Civil action commenced in the Superior Court Department on
October 17, 2018.

     The case was heard by Patrick M. Haggan, J., on a motion
for summary judgment.


     Andrew R. Gould, of Texas (Benjamin H. Duggan also present)
for the plaintiff.
     William J. Fidurko for the defendants.


     DITKOFF, J.  The plaintiff, Shauntoo Cottrell,[2] appeals from

a grant of summary judgment dismissing his complaint against the

_____

        [1] Colonial of Watertown, Inc.

        [2] Cottrell died during the pendency of this appeal, and the
personal representative of his estate was substituted as the

defendants, Edward Laidley and Laidley's employer, Colonial of Watertown, Inc. (Colonial), arising out of the plaintiff's personal injuries sustained when Laidley lost consciousness and rear-ended the bus the plaintiff was driving.  This case requires us to examine the doctrine of a sudden medical emergency negating negligence.  Although there is no genuine dispute of material fact that Laidley's untreated medical condition that included severe sleep apnea caused him to lose consciousness, we conclude that a genuine issue of material fact remains as to whether Laidley should have foreseen the emergency; specifically, whether he was aware of prior onsets of sleepiness or had experienced drowsiness in the hours leading up to the accident and thus was negligent in deciding to drive nonetheless.  We further conclude that, although the summary judgment record does not raise as a triable issue that Colonial was directly negligent in hiring or supervising Laidley, should Laidley be found negligent, Colonial would be vicariously liable for Laidley's negligence.  Accordingly, we reverse the judgment as to both defendants.

1.  Background.  "We recite the material facts in the light most favorable to the nonmoving party."  Matter of the Estate of Urban, 102 Mass. App. Ct. 284, 285 (2023), quoting Docos v. John

_____

plaintiff.  For ease of reference, we refer to Cottrell as the plaintiff.

Moriarty & Assocs., 78 Mass. App. Ct. 638, 639 (2011). In January 2017, Laidley, then fifty-five years old, applied for a position as a parts driver at Colonial, a car dealership in Watertown. Laidley's wife worked there as a receptionist. Because Colonial required its parts drivers to have "a clean driving record," Laidley submitted his driver's license as part of his application. Colonial then provided Laidley's license to its insurance company so that the insurance company could "clear it." Shortly thereafter, Colonial's insurance company informed Colonial that Laidley was cleared to drive. Colonial did not interview Laidley or conduct any further evaluation. In May 2017, Laidley's wife told him that he got the job.

As a parts driver, Laidley was responsible for driving to various locations to deliver or pick up motor vehicle parts. Laidley spent approximately half of each workday driving and the rest of the day on various other tasks. Although Laidley was overweight, Colonial's general manager, who saw Laidley three to four times a day, testified at a deposition that he never noticed Laidley having trouble breathing or needing to take an extra break at work. Colonial's general manager testified that Laidley was "a good employee" because, instead of sitting and waiting around for the next parts delivery, Laidley was always "looking to be busy."

Between May 2017, when Laidley was hired as a parts driver, and January 3, 2018, Laidley did not see a doctor, either for any medical problems or for annual physicals. In the days leading up to Wednesday, January 3, 2018, Laidley had a "productive cough."

On January 3, 2018, at approximately 12:30 P.M., Laidley was driving a parts truck for Colonial. At the time, the plaintiff was driving his usual bus route for the Massachusetts Bay Transportation Authority (MBTA), which ran from the Lechmere station in Cambridge to Clarendon Hill in Somerville. As the plaintiff approached the final stop on his route, he pulled out onto Broadway Street and waited for traffic to clear so that he could turn left to drop off his last passenger. While the plaintiff was waiting to turn left into the Clarendon Hill bus stop, Laidley, who was traveling behind the plaintiff, rear-ended the bus. At the moment of impact, the bus was not moving.

The impact from Laidley's vehicle pushed the bus forward approximately seventy-five feet. When the bus came to a complete stop, the plaintiff called dispatch to report that he had just "been struck." When the plaintiff exited the bus, he observed Laidley's vehicle traveling in reverse "[f]or at least a couple of seconds" before it struck a parked vehicle. After striking the parked vehicle, Laidley's vehicle traveled forward "a couple of feet" before coming to stop. As a result of the

accident, Laidley's vehicle sustained substantial damage.  The bus sustained minimal damage.

Approximately fifteen minutes later, emergency medical services arrived on scene.  Emergency medical personnel observed that Laidley had "labored breathing" and a "confused mental status."  Laidley "wasn't answering questions appropriately" and stated that he was "trying to get [his] story straight."  As Laidley was being treated for his injuries, he stated that he "was driving, felt a chest pain, and blacked out.  [He] didn't mean to hit the bus."  Laidley complained of pain in his neck, scapula, and foot as well as chest tightness, which he described as if someone were "'hugging' him under his armpits." Laidley stated that he "[did] not remember the accident nor [the] events leading up to the accident."

The bus passenger reported that, after Laidley hit the bus, Laidley "looked like he was having a seizure or a heart attack." The plaintiff did not see Laidley until after the accident, when Laidley was placed on a stretcher.  No one observed Laidley's physical appearance in the moments before the accident.

After the accident, Laidley was transported to the hospital where he was placed in a medically induced coma for approximately one month.  Laidley's doctors suspected that "a medical emergency caused the accident" when Laidley "lost oxygen to [his] brain."  When Laidley woke up, he had no recollection

of the accident and no recollection of the two to three weeks leading up to the accident.  Doctors suspected that Laidley suffered from sleep apnea, scheduled a sleep study, and "[s]trongly advised [him] against driving/working heavy machinery until resolved."

After the accident, Laidley was diagnosed with severe obstructive sleep apnea, high blood pressure, high cholesterol, and diabetes.[3]  Laidley had never been diagnosed with sleep apnea before.  Again, his doctor advised him not to drive until the "sleep apnea has improved with the treatment."  After several months using a continuous positive airway pressure device, Laidley reported that "[h]is frequent nocturnal awakenings have resolved to just 1" and that he "no longer is groggy in the morning."  Six months after the accident, the doctor approved of Laidley's resuming driving after a successful week of driving with his wife in the passenger seat.

Laidley testified at his deposition that prior to the accident he never had difficulty breathing, shortness of breath, chest pains, or trouble sleeping.[4]  Laidley testified that his wife had complained about his snoring for their entire thirty-

---

[3] When Laidley was diagnosed with sleep apnea, a sleep study revealed that he woke up "91 times per hour."

[4] The parties provided both us and the Superior Court with the full deposition transcripts, rather than providing snippets. This practice greatly eases our review of the evidence.

year marriage.  Despite this, Laidley did not recall ever leaving work early or starting work late because he was feeling tired.  Laidley testified that he did not feel lethargic except "when [he] was sleepy at night."  Laidley further testified that he was never informed by a doctor that the conditions that he was diagnosed with after the accident were a result of long-standing medical issues.  In addition, Laidley attested in his affidavit that prior to the accident he was never told by a doctor that it was unsafe to drive and he "had never experienced a loss of consciousness."  Laidley further attested that before the accident he "had never experienced any medical issues while [he] was driving that led [him] to believe that driving was unsafe."

In the course of his treatments Laidley made several statements to his sleep specialist, Dr. Michael Zaslow.[5]  Laidley described "'horrible snoring,' gasping and non-refreshing sleep."  Laidley stated that, although he was fatigued "some of the time" and was "apt to doze off watching television and in the lunchroom at work," he "never had micro-sleeps at red lights."  In addition, Laidley stated that he was "never able to sleep more than a few hours at a time consecutive[ly]" and that he "takes 2 or 3 naps per week for between 90 and 120 minutes."

_____

[5] The statements are contained within Dr. Zaslow's report dated April 12, 2018.

Subsequently, at a hospital follow-up, Laidley told his doctor that he had suffered from "frequent nocturnal awakenings" and had been "groggy in the morning" prior to sleep apnea treatment.

After the accident, the plaintiff sued the defendants seeking damages for medical expenses and pain and suffering that he incurred as a result of the accident.[6]  The plaintiff alleged that Laidley negligently rear-ended him, that Colonial was vicariously liable for Laidley's negligence and, inter alia, directly liable for negligent hiring and negligent supervision.[7]  In their answer the defendants asserted that, inter alia, "the accident in which the Plaintiff was injured was the result of a sudden medical emergency and therefore the Defendants [were] not liable."  After the parties exchanged discovery, the defendants moved for summary judgment on all of the plaintiff's claims.  The plaintiff opposed the motion asserting, among other things, that there was a factual dispute as to whether Laidley suffered from a sudden, unforeseeable medical emergency.

---

[6] The plaintiff alleged that he sustained "serious injuries to his neck, back, legs, head, shoulders, and other parts of his body."

[7] Contrary to normal practice, the complaint does not include counts.  Cf. Lane v. Winchester Hosp., 101 Mass. App. Ct. 74, 76 (2022) (complaint contained several counts alleging various theories of negligence).  Instead, it includes various theories of direct liability, only two of which the plaintiff pursued in opposing the defendants' motion for summary judgment.

Both parties presented expert medical opinions. One of the defendants' experts, Dr. Corey Hardin, opined that "Laidley lost consciousness before the accident due to hypoxemia" as a result of undiagnosed chronic obstructive pulmonary disease (COPD).[8] Dr. Hardin further opined that Laidley's "co-existent sleep apnea also played a role." The defendants' other expert, Dr. Amy Fogelman, opined that there were no pre-accident medical records where Laidley was told not to drive nor was Laidley experiencing any symptoms that would have indicated that he should not have been driving. Although Laidley had a "productive cough" in the days leading up to the accident, as well as elevated blood pressure and a history of smoking, Dr. Fogelman opined that none of these issues were reasons not to drive. Similarly, she opined that, although Laidley had a history of snoring, "[s]noring, without symptoms of excessive fatigue, is not an indication that one should not be driving." She also recounted that Laidley had testified that he did not recall "[d]aytime somnolence," nor was that noted in any of his records. Ultimately, Dr. Fogelman concluded that "there was

---

[8] No other medical professional, before or after, has diagnosed Laidley with COPD. Although there is no genuine dispute of material fact that Laidley suffered from severe sleep apnea at the time of the accident, there is a genuine dispute whether he suffered from COPD.

nothing to indicate to [Laidley] that he should not have been driving."

The plaintiff's expert, Dr. Meir Kryger, agreed with the defendants' expert evidence to the extent that Laidley's untreated sleep apnea "ultimately caused the accident." But unlike the defendants' experts, Dr. Kryger opined that Laidley "knew or should have known that his excessive sleepiness made it dangerous for him to operate a vehicle." Dr. Kryger opined that "Laidley had experienced prior sudden onsets of sleepiness because sleep apnea is not an acute condition and because [Laidley's] symptomology [obesity and snoring] was significant." Dr. Kryger explained that untreated sleep apnea is associated with "excessive daytime sleepiness." In particular, patients such as Laidley, "with an [apnea hypopnea index] of greater than 40 are at [an] increased risk." Dr. Kryger determined that, "[t]o a reasonable degree of medical probability, Laidley would have felt very drowsy while driving the vehicle on the date of the subject incident" and that "[t]he drowsiness should have compelled him not to drive further." Dr. Kryger also opined that, "[g]iven the significant symptoms described [obesity[9] and snoring], the defendant's symptoms of apnea and his excessive

---

[9] Dr. Kryger noted Laidley's body mass index (BMI) to be 38. BMI refers to a relationship between a person's weight and height. See Richardson v. Chicago Transit Auth., 926 F.3d 881, 884 (7th Cir. 2019).

sleepiness should have been apparent to both him and his employer."

After a hearing, the judge allowed the defendants' motion for summary judgment and dismissed the plaintiff's complaint. The judge found that there was no genuine dispute of material fact that Laidley suffered a sudden, unforeseeable medical emergency when he rear-ended the plaintiff and that, because Laidley was not liable, Colonial could not be held vicariously liable. As to the plaintiff's direct liability claims against Colonial, the judge determined that the summary judgment record did not raise a triable issue of negligent hiring or negligent supervision on the part of Colonial.[10] This appeal followed.

2. Standard of review. "We review a grant of summary judgment de novo to determine 'whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law.'" Chambers v. RDI Logistics, Inc., 476 Mass. 95, 99 (2016), quoting DeWolfe v. Hingham Ctr., Ltd., 464 Mass. 795, 799 (2013). "In deciding a motion for summary

---

[10] The judge also found that Colonial could not be held liable on the plaintiff's negligent entrustment claim. Because the plaintiff does not contest the grant of summary judgment on this claim on appeal, we need not address it. See Zoning Bd. of Appeals of Lunenburg v. Housing Appeals Comm., 464 Mass. 38, 55 (2013) ("Because the board did not argue this issue in its appellate brief, we need not reach it").

judgment the court may consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits." Bank of N.Y. Mellon v. Morin, 96 Mass. App. Ct. 503, 506 (2019), quoting Niles v. Huntington Controls, Inc., 92 Mass. App. Ct. 15, 18 (2017). "[A] judge may decide the issue as a matter of law when no rational view of the evidence permits a finding of negligence." Petrell v. Shaw, 453 Mass. 377, 381 (2009).

3. Sudden medical emergency. "To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant [committed a breach of] this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." Nguyen v. Massachusetts Inst. of Tech., 479 Mass. 436, 448 (2018), quoting Jupin v. Kask, 447 Mass. 141, 146 (2006). Under the sudden medical emergency doctrine, however, "a sudden and unforeseeable physical seizure rendering an operator unable to control his motor vehicle cannot be termed negligence." Ellingsgard v. Silver, 352 Mass. 34, 36 (1967), quoting Carroll v. Bouley, 338 Mass. 625, 627 (1959).[11]  A

_____

[11] For other cases recognizing the sudden medical emergency doctrine, see Fain v. Benak, 205 Conn. App. 734, 743 (2021); Patrick v. Henthorn, 184 N.E.3d 1195, 1199 (Ind. Ct. App. 2022); Hagenow v. Schmidt, 842 N.W.2d 661, 675 (Iowa 2014); Karl v. Terbush, 63 A.D.3d 1359, 1359-1360 (N.Y. App. Div. 2009); Norman v. Pearson, 2022-Ohio-4317, ¶¶ 27, 44 (Ct. App.); Shiner v. Ralston, 64 A.3d 1, 6 (Pa. Super. Ct. 2013); Simpson v. Rood, 178 Vt. 474, 476 (2005). See also Sutherlin v. Fenenga, 111

defendant who invokes the sudden medical emergency doctrine in moving for summary judgment must "establish the existence of the claimed medical emergency and its unforeseeable nature" with "competent or expert medical evidence." Pitt v Mroz, 146 A.D.3d 913, 914 (N.Y. App. Div. 2017). See Carroll, supra (defendant bears burden of proving sudden medical emergency). "[T]he foreseeability inquiry in [these] cases . . . frequently amounts to a consideration by the factfinder of whether the defendant driver should have been driving at all." McCoy v. Murray, 2009-Ohio-1658, ¶ 14 (Ct. App.), quoting Roman v. Estate of Gobbo, 2003-Ohio-3655, ¶ 51.

Here, although there is no genuine dispute of material fact that a sudden medical emergency caused Laidley to lose consciousness while driving, a genuine dispute of material fact exists concerning whether Laidley was either aware of prior onsets of sleepiness or had experienced drowsiness in the period before the accident. See Dunlap v. W.L. Logan Trucking Co., 2005-Ohio-2386, ¶ 6 (Ct. App.) (record indicated that "[the defendant] knew or should have known that he had a propensity to fall asleep at unpredictable times"). To be sure, the defendants presented considerable evidence that Laidley's loss

N.M. 767, 774-775 (Ct. App. 1991) (defense of sudden emergency); Wiggins v. East Carolina Health-Chowan, Inc., 234 N.C. App. 759, 766 (2014) (same).

of consciousness was not foreseeable. Laidley testified that prior to the accident he never had difficulty breathing, shortness of breath, chest pains, or trouble sleeping. In addition, Laidley attested that before the accident he had never been told by a doctor that it was unsafe to drive, he "had never experienced a loss of consciousness," and he "had never experienced any medical issues while [he] was driving that led [him] to believe that driving was unsafe." See Cincinnati Ins. Co. v. Allen, 2008-Ohio-3720, ¶ 43 (Ct. App.) ("There was no evidence that [the defendant] had ever lost consciousness due to the lightheadedness prior to the September 2004 accident").

Although Laidley had a "productive cough" in the days preceding the accident, in addition to elevated blood pressure and a history of smoking, Dr. Fogelman opined that none of these would have impacted Laidley's ability to drive. Similarly, despite Laidley's history of snoring for his "entire marriage," Dr. Fogelman opined that "[s]noring, without symptoms of excessive fatigue, is not an indication that one should not be driving," given that Laidley did not recall any pre-accident symptoms of excessive lethargy. Moreover, Laidley did not recall any "[d]aytime somnolence" nor was it noted in any of his records.

Dr. Fogelman, however, did not review the treatment records of the sleep specialist, Dr. Zaslow, or Laidley's other

treatment records after the initial hospitalization. Indeed, she seemed to be unaware that Laidley suffered from severe sleep apnea. Moreover, although she opined that "there was nothing to indicate to [Laidley] that he should not have been driving," she ignored the fact that Laidley had no recall of his symptomology (or, indeed, anything) in the weeks leading up to the accident.

In any event, Dr. Fogelman's opinion was contested by competent contrary medical evidence. Dr. Kryger opined that "Laidley had experienced prior sudden onsets of sleepiness because sleep apnea is not an acute condition" and Laidley had "the main symptoms of sleep apnea (obesity [BMI=38], snoring) for decades prior to the crash." Cf. Denson v. Estate of Dillard, 116 N.E.3d 535, 542 (Ind. Ct. App. 2018) ("there is no evidence that [the defendant] suffered any symptoms prior to his decision to drive . . . which would have alerted him of the impending physical incapacity"); Duchene v. Finley, 2015-Ohio-387, ¶ 3 (Ct. App.) (underlying disease causing defendant's sudden loss of consciousness while driving "was not clinically apparent" and he "was asymptomatic until that moment"); McCoy v. Murray, 2009-Ohio-1658, ¶ 22 (Ct. App.) ("there was nothing in [the defendant's] history that would lead a reasonable person to believe they were in danger of suffering a loss of consciousness"). In an appropriate case, a competent medical

expert[12] can determine from a postaccident diagnosis what symptoms a patient must have been experiencing prior to the accident.  Cf. Meyers v. Shontz, 251 So. 3d 992, 998 (Fla. App. 2018) (medical expert "theorized that the findings from the postaccident [magnetic resonance imaging] took decades to develop and did not show any sign of being related to trauma, such as would occur in a car accident").

Although Laidley testified that he was never lethargic except "when [he] was sleepy at night," Laidley had no memory of the weeks leading up to the accident and thus no memory whether he was lethargic in the relevant time period.  Dr. Kryger's report (if credited) suggests that it was not possible or at least highly unlikely that Laidley was not lethargic before the accident, as untreated sleep apnea is associated with "excessive daytime sleepiness."  This opinion was supported by the postaccident medical records that were not reviewed by Dr. Fogelman.  Dr. Zaslow's report reflects that Laidley stated a few months after the accident that "he's never able to sleep more than a few hours at a time consecutive," that "[h]e's apt to doze off watching television and in the lunchroom at work," and that he had "'horrible snoring,' gasping and non-refreshing

---

[12] The defendants, although strongly asserting that Dr. Kryger's opinion is not credible, raise no challenge to his expertise or the admissibility of his opinion, at least for summary judgment purposes.

sleep," and "wakes up frequently."  Similarly, months after the accident, Laidley told his doctor that he had suffered from "frequent nocturnal awakenings" and had been "groggy in the morning" prior to sleep apnea treatment.  These facts all support Dr. Kryger's opinion.

The fact that Laidley's medical records before the accident do not mention sleep apnea symptoms may establish that he "did not complain to his medical providers about [sleep apnea] symptoms, and is certainly circumstantial evidence that supports a finding that the [loss of consciousness] was unforeseen. However, by no means does it conclusively establish that [Laidley] never experienced symptoms prior to the date of the collision."  Shiner v. Ralston, 64 A.3d 1, 6 (Pa. Super. Ct. 2013).  Although Laidley was not diagnosed with sleep apnea until after the accident, Dr. Kryger opined that, on the day of the accident, "Laidley would have felt very drowsy while driving the vehicle" and that Laidley "knew or should have known that his excessive sleepiness made it dangerous for him to operate a vehicle."  See Dunlap, 2005-Ohio-2386, ¶ 51 ("despite the fact that [the defendant's] sleep apnea was not specifically diagnosed until after the accident, [the defendant] was aware of excessive fatigue and aware of falling asleep at inopportune or unusual moments prior to the accident").  As Laidley had no memory of the weeks leading up to the accident and the

defendants presented no medical expert testimony to the contrary, a jury could credit Dr. Kryger's opinion. Even if Laidley did not know why he was experiencing excessive sleepiness, a jury could determine that he was negligent in driving (assuming, of course, the jury credit Dr. Kryger's opinion). Accordingly, a genuine issue of material fact exists as to whether Laidley's loss of consciousness was reasonably foreseeable and, thus, whether Laidley was negligent in driving that day. See Roberts v. Boehl, 2018-Ohio-1118, ¶ 30 (Ct. App.) ("in a case of sudden medical emergency where . . . the issue of foreseeability is doubtful, the question should be submitted to the jury or factfinder").

4. Colonial's liability. Colonial acknowledges that, on the day of the accident, Laidley was acting within the course and scope of his employment as a parts driver. As such, if Laidley is found liable at trial, Colonial will be vicariously liable. See Lev v. Beverly Enters.-Mass., Inc., 457 Mass. 234, 238 (2010), quoting Dias v. Brigham Med. Assocs., 438 Mass. 317, 319-20 (2002) ("Under the doctrine of respondeat superior, 'an employer . . . should be held vicariously liable for the torts of its employee, or servant, committed within the scope of employment'").

In addition to vicarious liability, the plaintiff advanced theories of direct liability, including negligent hiring and

negligent supervision.[13]  See Doe v. Roman Catholic Bishop of Springfield, 490 Mass. 373, 386 (2022).  "The doctrine of negligent hiring or retention provides that 'an employer whose employees are brought in contact with members of the public in the course of the employer's business has a duty to exercise reasonable care in the selection and retention of his employees.'"  El Koussa v. Attorney Gen., 489 Mass. 823, 835 (2022), quoting Foster v. The Loft, Inc., 26 Mass. App. Ct. 289, 290 (1988).  Under this doctrine, "[n]egligence in hiring or retaining a person to perform given tasks who is unfit for the job" provides "a ground of liability for the harmful effects of the choice upon related persons."  Or v. Edwards, 62 Mass. App. Ct. 475, 483 (2004).  Once an employee is hired, "[e]mployers are responsible for exercising reasonable care to ensure that their employees do not cause foreseeable harm to a foreseeable class of plaintiffs."  Helfman v. Northeastern Univ., 485 Mass. 308, 326 (2020), quoting Roe No. 1 v. Children's Hosp. Med. Ctr., 469 Mass. 710, 714 (2014).

---

[13] In the Superior Court, the defendants argued that the existence of a viable claim for vicarious negligence negates any claims for negligent hiring or negligent supervision.  The defendants do not press this theory on appeal, and therefore we do not reach it.  Cf. Trinh v. Gentle Communications, LLC, 71 Mass. App. Ct. 368, 376 n.9 (2008) (under certain circumstances, punitive damages available for direct claim but not vicarious claim).

Here, although the plaintiff presented evidence that Colonial's hiring screening was minimal, there is no evidence to suggest that a more thorough screening process would have revealed that Laidley was unfit to drive.  Cf. Or, 62 Mass. App. Ct. at 488 ("Reasonable inquiry would have disclosed [the employee's] shady background with criminal history, but only a limited, hurried investigation was undertaken").  The summary judgment record reflects that, at the time Laidley was hired, Colonial required only that each parts driver have "a clean driving record."  There being no suggestion that an employer hiring a truck driver has a duty to subject applicants to a full physical (much less nocturnal polysomnography), given that Laidley's sleep apnea was undiagnosed at the time and there were no medical records stating that Laidley should not drive, the plaintiff has presented no evidence that Laidley's unfitness would have been discovered through more diligent screening.[14]

Similarly, there is no evidence that, at the time of the accident, Colonial knew or should have known that it was unsafe for Laidley to drive.  See Nelson v. Salem State College, 446 Mass. 525, 527 (2006) (affirming summary judgment where "there

---

[14] The plaintiff agrees that Colonial had no independent duty to require Laidley to submit to a physical examination. The plaintiff properly makes no argument that an employer has a duty to restrict employees from driving simply because they are overweight.

was no negligent supervision or training of the defendants' employees"). Colonial's general manager, who saw Laidley three to four times a day, testified that he never noticed Laidley having trouble breathing or needing to take an extra break at work. To the contrary, he testified that, instead of sitting and waiting for the next parts delivery, Laidley was always "looking to be busy." Although Laidley told Dr. Zaslow several months after the accident that he was "apt to doze off . . . in the lunchroom at work," the mere fact that an employee naps during a lunchbreak would not put an employer on notice that the employee was unfit to drive.

To be sure, Dr. Kryger opined that Laidley's "symptoms of apnea and his excessive sleepiness should have been apparent to both him and his employer." Dr. Kryger, however, described those symptoms as "obesity [BMI=38], snoring." Colonial had no reason to know that Laidley snored, and we do not take Dr. Kryger as opining that it should have been apparent to Colonial merely from Laidley's obesity that he suffered from sleep apnea or was unsafe to drive. In any event, Dr. Kryger's nonmedical opinion concerning what an employer should know is well outside his area of expertise and insufficient to create a genuine issue of material fact. See Borella v. Renfro, 96 Mass. App. Ct. 617, 627 (2019) ("The conclusory statements of witnesses . . . cannot defeat summary judgment"). Accordingly,

there is no triable issue that Colonial was either negligent in its hiring or in its supervision of Laidley.  See <u>Helfman</u>, 485 Mass. at 326 (claim fails where "there is no evidence that any of the defendants [were] negligent in training or supervising its [employees]").

    5.  <u>Conclusion</u>.  So much of the judgment that grants summary judgment in favor of Colonial on the plaintiff's claims of direct negligence is affirmed.  In all other respects, the judgment is vacated and remanded for further proceedings.

<u>So ordered</u>.