[Cite as *Ward v. Bond*, 2015-Ohio-4297.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| BRIAN S. WARD | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO. 2015-CA-2 |
| | : | |
| v. | : | T.C. NO. 2012-CV-312 |
| | : | |
| JAMES D. BOND | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___16th___ day of ____October____, 2015.

. . . . . . . . . . .

BRIAN S. WARD, Inmate #A665-017, Pickaway Correctional Institution, P. O. Box 209, Orient, Ohio 43146
    Plaintiff-Appellant

BRYAN K. STEWART, Atty. Reg. No. 0042122, 104 West Main Street, Tipp City, Ohio 45371
    Attorney for Defendant-Appellee

. . . . . . . . . . . .

FROELICH, P.J.

{¶ 1} Brian S. Ward appeals pro se from a judgment of the Champaign County Court of Common Pleas, which entered summary judgment in favor of James D. Bond on Ward's "Complaint for Declaratory Judgment and for Monetary Damages." For the following reasons, the judgment of the trial court will be affirmed.

{¶ 2} Ward was arrested in January 2010 for driving under the influence. Ward had previously been convicted of driving under the influence, and he knew that he faced incarceration for the 2010 offense. Ward owned property at 431 S. Kenton Street in Urbana, and he feared that he would lose his property to foreclosure or condemnation while he was incarcerated. Bond was a lifelong friend of Ward's, and the men discussed Bond's caring for Ward's property during Ward's incarceration.

{¶ 3} In May 2012, Ward was convicted and sentenced to 6½ years in prison. Around the time that Ward was convicted, Ward and Bond entered into an oral agreement whereby Bond would care for the Kenton Street property; the specific terms of this agreement are in dispute. Sometime after Ward's conviction, Ward executed a limited power of attorney to assist Bond in caring for the property.

{¶ 4} Ward filed a complaint against Bond in October 2012, and he filed an amended complaint in April 2013, with leave of court. The amended complaint alleged "Breach of Oral Contract/Promissory Estoppel," "Fraud, Negligence, Gross Negligence, Recklessness, and Malfeasance," and "Conspiracy to Deprive Property and Tortious Acts in Concert." In short, Ward alleged that Bond had used Ward's money for improper purposes, failed to secure a renter for the property as promised, and permitted Ward's cousin to live at and work on the property, contrary to Ward's express wishes. In November 2014, Bond filed a motion for summary judgment, which Ward opposed. On December 16, 2014, the trial court granted Bond's motion for summary judgment.

{¶ 5} Ward appeals, raising three assignments of error. The assignments assert that the trial court erred in granting summary judgment because genuine issues of material fact existed, because "a fiduciary duty was owed and breached," and because

summary judgment was "against the manifest weight of the evidence."

{¶ 6} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.,* 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler,* 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Dresher v. Burt,* 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996).

{¶ 7} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Id.* Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 8} We review the trial court's ruling on a motion for summary judgment de novo. *Schroeder v. Henness,* 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, ¶ 42. De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether, as a matter of law, no genuine issues exist for trial. *Brewer v. Cleveland City Schools Bd. of Edn.,* 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal Co.,* 64 Ohio St.2d

116, 119-20, 413 N.E.2d 1187 (1980). Therefore, the trial court's decision is not granted deference by the reviewing appellate court. *Powell v. Rion,* 2012-Ohio-2665, 972 N.E.2d 159, ¶ 6 (2d Dist.), citing *Brown v. Scioto Cty. Bd. Of Commrs.,* 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist.1993).

{¶ 9} Civ.R. 56(C) lists the types of evidentiary materials that a court may consider in rendering summary judgment; these include "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, filed in the action." Absent an exception, hearsay may not be considered in a motion for summary judgment. *Johnson v. Southview Hosp.,* 2d Dist. Montgomery No. 25049, 2012-Ohio-4974, ¶ 20, citing *Knoth v. Prime Time Marketing Mgmt., Inc.,* 2d Dist. Montgomery No. 20021, 2004-Ohio-2426, ¶ 13 ("It is fundamental that the evidence offered by affidavit in support of or in opposition to a motion for summary judgment must also be admissible at trial, albeit in different form, in order for the court to rely on it.")

{¶ 10} Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement," as included in the definition of hearsay, is an oral or written assertion or nonverbal conduct of a person if that conduct is intended by him as an assertion. Evid.R. 801(A).

{¶ 11} Ward's complaint contained a lengthy list of wrongdoing that he alleged Bond had committed, including fraud, negligence, recklessness, breach of oral contract, conspiracy, "tortious acts in concert," and malfeasance; he sought a declaratory judgment as well as monetary damages for breach of contract and mental anguish. The trial court

characterized the claims as follows: Count One: breach of oral contract and promissory estoppel; Count 2: breach of fiduciary duty (encompassing fraud, negligence, gross negligence, recklessness and malfeasance); and Count 3: civil conspiracy (encompassing Ward's claim that Bond acted in concert with Ward's cousin, Robert Ward, to deprive him of real and personal property). The trial court's enumeration of the offenses alleged in Ward's complaint aptly characterizes the nature of Ward's claims, and he does not object to this characterization on appeal. We will use the same framework for our discussion.

{¶ 12} Bond attached numerous affidavits to his motion for summary judgment. These documents detailed his relationship with Ward and the evolution of their agreement about his responsibility for the Kenton Street house while Ward was in prison. Bond stated that he initially agreed only to mow the lawn and watch for vandalism of the house. Ward later begged Bond by letter to help keep "his residence in order" and to help prevent foreclosure or condemnation. Bond agreed to help due to their longstanding friendship.

{¶ 13} In his affidavit, Bond stated that he found the house to be in "deplorable" condition, with leaks, damaged siding, a gutted living room, and a porch that was collapsing. The utilities had been turned off due to unpaid bills. Bond requested from Ward a limited power of attorney to deal with the property, because the utility companies would not deal with him without one.

{¶ 14} Bond's affidavit detailed some efforts on his part to call in favors or to barter for labor on the property. One such effort related to Robert Ward, Brian's cousin. Bond ran into Robert, who Bond knew to be experienced in construction and roofing, and Bond talked with Robert about the possibility of working on Ward's residence to make it

habitable. Robert agreed. Robert was paid $375 and lived in the house for nine days, during which time he repaired leaks in the roof, rebuilt the roof of the porch, repaired siding and removed trees that were encroaching on the siding. However, when Brian Ward learned that Robert was at the house, he called the Urbana police, who contacted Bond about Robert's presence at the house. Bond explained that Robert had been living and working there with Bond's permission pursuant to the power of attorney. Bond found this incident with the police to be "personally embarrassing." After Bond explained the arrangement to Ward, Ward sent Bond three letters in which he threatened both Bond and Robert. Bond thereafter decided that he would no longer assist Ward with respect to the house.

{¶ 15} Bond further stated that all of the funds he expended on Ward's behalf under the power of attorney had been "utilized in an effort to make his residence habitable" so that it could be rented until Ward was released from prison. He detailed some of these expenditures in the affidavit, as well as funds that he had sent to Ward's commissary account. He also attached receipts and pictures of the property before and after the repairs he had facilitated.

{¶ 16} Bond's affidavit also described his efforts to rent the house to two different individuals and explained that these individuals were unwilling to rent the property in light of its condition. He denied that he had ever found someone willing to rent the property. Bond admitted that his plan had been to rent the house, but he denied that he had ever "guaranteed" Ward that he would rent the house or that he had ever found someone willing to rent it.

{¶ 17} Bond attached to his affidavit a copy of the limited power of attorney,

receipts from Lowe's and the City of Urbana Utilities, and Moneygram and money order receipts for funds sent to Ward in prison.

{¶ 18}   Bond also attached to his motion for summary judgment affidavits from Robert Ward, from Bond's wife, daughter, and mother, from one of the contractors he attempted to hire, and from one of the prospective tenants who had looked at the house. Robert's affidavit corroborated Bond's statements about the work Robert did on the exterior of the house, the amount of time he lived there, and the amount he was paid; he denied removing or selling any fixtures or other items located at the residence.   The affidavits of Bond's wife, daughter, and mother attested to the receipt of letters from Ward in which he threatened to kill Bond and burn down his house.   Bond's wife stated that she had burned these letters because they were so upsetting to her.   Bond's mother averred that, in addition to seeing the letters, she had received a phone call from Ward in which he threatened to kill Bond and to burn down their house.

{¶ 19}   In an affidavit attached to the motion for summary judgment, the contractor stated that the residence had been in "serious disrepair" when he saw it, that it was "basically uninhabitable," and that he did not have time to undertake the project of rehabbing the house.   The prospective tenant stated that, when she inspected the house, only the kitchen and a small hallway "appeared to have not been demolished," that the upstairs was "totally uninhabitable," that the walls were in poor condition with numerous holes, and that "the electrical fuse box was unbolted from the wall and merely hanging by its wires."

{¶ 20}   Ward attached to his complaint numerous letters written by Bond to Ward while Ward was in prison.   To the extent that these letters relate to Bond's care of the

house, they detail Bond's difficulty in paying for the repairs and the reestablishment and maintenance of gas, electricity, and water (necessary to avoid condemnation and to complete the repairs), his struggle to pay the property taxes on the house, and his need for a power of attorney to effectively manage the property. Bond also apologized for letting "Bob" (presumably Ward's cousin, Robert) stay at the house, but described his intent to use "Bob" for free labor. Although they are attached to the complaint, none of these letters comprise "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact" that may be considered for purposes of summary judgment. Civ.R. 56(C). They also constitute hearsay. Moreover, even if the letters could properly be considered, they do not create a genuine issue of material fact regarding any of Ward's claims against Bond.

{¶ 21} When he filed his motion contra Bond's motion for summary judgment (at which time Ward was represented by counsel), Ward attached his own affidavit. In the affidavit, he stated that his agreement with Bond had been for Bond to "periodically check on and maintain the premises and to see that taxes and insurance premiums were paid" during his incarceration. Ward also asserted that he had told Bond, "specifically and repeatedly," that his cousin Robert Ward should not be allowed to have any connection or association with the property; Ward believed that Robert would engage in illegal activity at or damage the property. Ward stated that, at the time of his incarceration, the kitchen of his house had been recently renovated and all utilities and taxes were current. Ward denied making any threats against Bond when he learned that Robert had been at the house, but he acknowledged that he contacted the Urbana Police Department. Ward stated that, after terminating Bond's power of attorney, he sold the house at "a significant

loss," for a price of $14,313. He attached an unverified statement from a land investment company which showed that the house sold for $16,000, but that after fees and property taxes were deducted, Ward received $14,313.

{¶ 22} In a reply memorandum, Bond argued that Ward had failed to establish any damages or that the house had been in a "rentable" condition at any time. In a second affidavit attached to the reply, Bond also stated that Ward had told Bond that Ward purchased the house for $12,000, which Bond subsequently confirmed through the county auditor's website (2009 sale). Bond asserted that Ward's sale of the property for $16,000 after purchasing it for $12,000 demonstrated that Ward's claimed loss on the sale of the property was a "blatant misrepresentation."

{¶ 23} On the breach of contract claim, the trial court concluded that Ward had "offered no evidentiary quality materials showing that a prospective tenant had agreed to rent the premises and that [Bond] caused this tenant to breach the contract." The court further found that summary judgment was appropriate on the promissory estoppel claim because, insofar as no prospective tenant had agreed to rent the house, Ward had failed to show that he relied on or he had been damaged by any breach of an agreement to rent the house.

{¶ 24} On the claim for breach of fiduciary duty, Ward claimed that Bond had taken funds from Ward's bank account to pay utilities and other expenses, and that Robert Ward (who had access to the house because of Bond) had taken items from the house and sold them. The trial court found that the power of attorney had permitted Bond to expend Ward's funds for insurance, taxes, and utilities on the residence; Ward "offered no evidentiary-quality materials suggesting that [Bond] had agreed to pay the insurance,

taxes, and other obligations out of his own pocket." Thus, the court found, as a matter of law, that Bond did not breach his fiduciary duty by doing so. The trial court found that Ward had failed to demonstrate a genuine issue of material fact that Robert Ward had damaged or taken items from the residence, considering Ward's acknowledgement of its poor condition and the need for repairs to be made to attract tenants. The court also observed that Ward offered no non-hearsay evidence in support of his allegation that someone had purchased a door from the residence from Robert Ward. Additionally, the court found that no evidence was presented to support Ward's suggestion in his memorandum contra the motion for summary judgment that Bond's consultation with a contractor about performing work on the house breached Bond's fiduciary duty; the contractor did not perform any work on the house.

{¶ 25} Finally, the court concluded that, even assuming that Robert's presence at the residence were a breach of Bond's fiduciary duty, Ward failed to create a genuine issue of material fact that he had suffered any damages as a result. It also concluded that Ward had failed to offer any evidentiary materials to establish the value of the house when he went to prison, such that the sale price would demonstrate a diminution in value.

{¶ 26} Ward's claim for civil conspiracy was premised on Bond's breach of his fiduciary duty by acting in concert with Robert Ward to deprive Ward of his real and personal property. Having found no breach of fiduciary duty under the second claim, the court found no genuine issues of material fact as to a civil conspiracy.

{¶ 27} Based on Bond's affidavits, which were offered in accordance with Civ.R. 56(C), the trial court properly concluded that Ward's evidentiary materials failed to create a genuine issue of material fact as to any of his claims or to show, more generally, that

he suffered any damages as a result of Bond's effort to manage and improve his property while he was in prison.   Accordingly, the assignments of error are overruled.

**{¶ 28}**   The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Brian S. Ward
Bryan K. Stewart
Hon. J. Timothy Campbell