[Cite as *Norman v. Pearson*, 2022-Ohio-4317.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| IESHA S. NORMAN, et al. | : | |
| | : | |
| Plaintiffs-Appellants | : | Appellate Case No. 29506 |
| | : | |
| v. | : | Trial Court Case No. 2020-CV-2923 |
| | : | |
| MARK E. PEARSON, JR. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of December, 2022.

. . . . . . . . . . .

ROBERT B. ACCIANI, Atty. Reg. No. 0096025, 600 Vine Street, Suite 1600, Cincinnati, Ohio 45202
     Attorney for Plaintiffs-Appellants

BRIAN L. WILDERMUTH, Atty. Reg. No. 0066303 & TABITHA D. JUSTICE, Atty. Reg. No. 0075440, 50 Chestnut Street, Suite 230, Dayton, Ohio 45440
     Attorneys for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Iesha S. Norman, Justin Norman, and Justin Norman as guardian of Liona Norman ("Appellants") appeal from the trial court's order that granted summary judgment in favor of Mark E. Pearson on their negligence claim. The trial court found that Appellants had failed to meet their burden under Civ.R. 56 to demonstrate any genuine issue of material fact and that Pearson was entitled to judgment as a matter of law, based upon the defense of sudden medical emergency, after Pearson drove into a vehicle driven by Iesha Norman. We affirm the judgment of the trial court.

{¶ 2} Appellants filed their negligence complaint against Pearson on July 28, 2020. They alleged that on January 10, 2019, Iesha was operating a motor vehicle on Chambersburg Road in Huber Heights when Pearson negligently caused a head on collision with Iesha's vehicle. According to the complaint, Iesha and Liona, a passenger in Iesha's vehicle, suffered temporary and permanent injuries. Appellants asserted a derivative claim on behalf of Justin for loss of consortium. Finally, Appellants claimed that United Health Care claimed a subrogated interest in the proceeds of the litigation.

{¶ 3} Pearson answered the complaint on August 27, 2020. He asserted, among other things, that he had been "confronted with a sudden medical emergency" at the time of the accident, which absolved him of responsibility.

{¶ 4} After discovery was conducted, Pearson filed a motion for summary judgment on January 5, 2022, asserting that Appellants' claims were barred by the sudden medical emergency defense. Pearson attached an affidavit in which he averred

that he had been diagnosed with diabetes in 1988 and had suffered a diabetic emergency that led to the automobile accident on January 10, 2019. According to Pearson, he had never previously been involved in a car accident related to his diabetes. Pearson averred that he had had seven instances of severe hypoglycemia over a period of 30 years, and none of them had happened while driving a car. He also stated that he had been under the regular care of a physician since being diagnosed with diabetes and that no physician or other medical provider had ever advised him not to drive or to take any additional precautions while driving due to his diabetes. Finally, Pearson averred that, prior to the accident, he had "never lost awareness of [his] surroundings during a hypoglycemic event."

{¶ 5} Pearson also attached an affidavit from Ashley Davis. Davis, who witnesses the accident, stated that, while she was turning right onto Chambersburg Road from Brandt Pike, she had observed "a green Jeep fly like a bat out of hell from Speedway. He hit the curb on the right side of the street when leaving Speedway. He sped off at a high speed swerving, almost hitting a van. Right after missing the van, he drifted into the opposite lane hitting the other car head on."

{¶ 6} Rick Demis also witnessed the accident, and Pearson attached his affidavit to his motion for summary judgment. Demis averred that he had seen "the green Jeep pull out of Speedway turned west on Chambersburg. Jeep hit the curb and turned into oncoming traffic and struck the Silver Chevy Equinox. I checked on the Jeep and the driver was unconscious * * *."

{¶ 7} Pearson also filed his deposition. As background, Pearson testified that he

had worked for Dayton Freight Lines for over 34 years and was an operations supervisor; Pearson supervised 30 forklift operators who load semi-trucks. He testified that he walks approximately four miles a day while at work, that he also does some lifting at work, and that his job was "mentally strenuous" because of the large volume of materials that were moved in a four-hour period. He worked from 5:00 a.m. to 2:00 p.m., Monday through Friday, and had completed the 12th grade.

{¶ 8} With respect to the accident, Pearson stated that he did not remember the day of the week on which the accident occurred, but that he knew that it was on January 10, 2019. He stated that he was aware of the time of the accident from the police report. According to Pearson, he left work between 1:30 and 2:00 and was going to Meijer for groceries; after not finding what he was looking for a Meijer, he remembered going to his car to go to Walmart, but from then on his memory was "blurry." He testified that the Meijer store was half a mile from his work.

{¶ 9} Pearson stated that he could not explain why he did not make it to Walmart, because his "sugar levels" had "dropped low and caused confusion," and he had missed his destination of Walmart. Pearson testified that he believed his blood sugar "must have dropped" because that was the only reason that he "would have been in the condition that [he] was in"; "[c]onfusion sets in when my blood sugar levels drop low." Pearson stated that he had experienced this before "but never to that degree" in 30 years of being diabetic. Pearson explained that it was not uncommon for a Type 1 diabetic to have ups and downs; when his blood sugar is high, he feels "very worn out" with "[a]lmost flu-like symptoms" and a little nausea, whereas when his blood sugar is low, he

experiences confusion and a feeling similar to inebriation.

{¶ 10} Pearson stated that, after the accident, he went to an endocrinologist and "chang[ed] everything that [he] was doing prior to the accident." At the time of the deposition, he had a blood glucose sensor that was attached to him and had an insulin pump that communicated with the sensor, so that he did not experience ups and downs like he had in the past. According to Pearson, he had not had another incident in which his sugar dropped and he had been "unconscious * * * or discombobulated" since the accident, because the pump alerts him before it gets to that point. Pearson testified that the pump was prescribed for him on January 22, 2019. Prior to the accident, Pearson had used a glucometer, testing himself three times a day at breakfast, lunch, and dinner by means of a fingerstick.

{¶ 11} Pearson submitted notes from Dr. Parilo's January 22, 2019 appointment with Pearson. Pearson acknowledged that, in a section titled "History of Present Illness," the notes stated that he had a history of "hypoglycemia unawareness." Pearson testified that, based on his conversation with Dr. Parilo, he (Pearson) assumed that the "unawareness" to which the notes referred related to how quickly "it had came on." Pearson also acknowledged that the notes indicated his blood glucose had been 26 milligrams, which was "severely low." Pearson stated that he believed he had had a "hypoglycemic event" on January 10, 2019, and that he had had "several" other hypoglycemic events in the year prior to the accident, "but nothing ever to the degree of the 26." Pearson stated that his pump alerts him at 74 that his sugar is dropping low, but he is not "unaware" at that level. Pearson testified that there's a "fine line - - between

70 and 50," referring to lack of awareness, and that the worst his lack of awareness had ever been was on the day of the accident.

{¶ 12} Pearson testified that his "second worst" hypoglycemic event was an incident at work when his coworkers called the paramedics; this event had occurred within the previous three years. Pearson had been treated by the paramedics and not taken to the hospital. According to Pearson, that event had occurred because he was unable to ingest sufficient carbohydrates "to counteract the insulin" while working; he did not give himself "enough time to get into the office and get something to eat." He stated that he had been aware during that event and had asked coworkers to help him reach the break room, where he drank orange juice. Pearson explained that drinking orange juice is a fast-acting solution to the problem, but it doesn't last very long, so the paramedics also administered medication. Pearson stated that when the paramedics tested his blood sugar, it was "in the 20's"; he described that he had "lost all of [his] senses" at that time but "was still aware" of his surroundings and was "not unconscious."

{¶ 13} When asked if failing to eat something had always caused his severe hypoglycemic events, Pearson responded that stress was also "a major factor" and had "a tendency to counteract * * * with your blood sugar." He also stated that taking too much insulin relative to carbohydrates eaten could also cause a hypoglycemic event.

{¶ 14} During Pearson's deposition, records from his emergency room visit at Miami Valley Hospital after the accident were introduced. Appellants' counsel read from the attending physician's notes, which stated that Pearson had reported switching to a relatively new insulin pen with a "70/30 mix" in the previous three or four days and had

"found himself to be hypoglycemic repeatedly." Pearson testified that he had switched insulin in consultation with his insurance company and his doctor about a month before the accident; he had previously used "the 75/25 mix," and after the switch he was hypoglycemic more often. Pearson reported having had seven severe hypoglycemic events in 30 years, which he defined as a blood sugar level less than 50. But he stated that he knew his blood sugar level only after testing following a severe event; "[t]hat's the only way I'm going to know if it was severe."

{¶ 15} Pearson testified that he was not aware of any severe event between the workplace event and the car accident. He testified that, in 2015, a year before the incident at work, he was in bed and his wife recognized that he was having an "insulin reaction" because he was "sweating profusely" and "she woke up wet"; his wife administered orange juice and sugar and then he got something to eat. Pearson did not require medical attention on that occasion and believed he had not consumed enough carbohydrates.

{¶ 16} Describing another incident, Pearson stated that at a pool party at his sister's home in 2015 or 2014, his carbohydrate intake was not what it should have been and that, coupled with "excessive play and vigor," made his sugar levels drop quickly. Pearson also recalled that he had been "sweating real bad"; needing to urinate was also sometimes a symptom that his blood sugar was low. He remembered the incident and had not lost consciousness; it took about 30 minutes to get his sugar level back above 50 by drinking "coke" and eating something. Pearson stated that he had "started to get confused" but that the symptom of confusion had appeared last.

{¶ 17} Pearson recalled one other incident within six months of the pool party where his wife awakened him in bed due to excess sweating; he again recovered by drinking orange juice mixed with sugar and believed he had failed to consume enough carbohydrates the previous night.

{¶ 18} Pearson testified that most of his hypoglycemic events occurred because his carbohydrate intake had not been enough to counteract the insulin he had taken that day. Prior to obtaining the insulin pump, he had followed a regular routine to care for his diabetes: he got up at 3:00 a.m., administered his insulin shot at 4:00 a.m., then ate breakfast. He checked his blood sugar before mealtimes with the glucometer and, depending on the reading and how he felt, he had taken insulin up to five times a day.

{¶ 19} Pearson stated that, on the day of the accident, he had administered his insulin and had had an Aunt Jemima breakfast entrée before going to work; he had a peanut butter sandwich "and probably some chips" for lunch around 10:30 or 11:00 a.m. He then left work around 1:30 p.m. Pearson stated that he had not consumed any carbohydrates after lunch and leaving work. He did not specifically remember checking his blood sugar at work that day, but based on his routine, he would have checked it that day. Pearson stated that he did not talk to anyone before he went to Meijer, and he remembered leaving Meijer with the purpose of going to Walmart.

{¶ 20} Pearson testified that, on the day of the accident, which happened at 3:55 p.m., he did not remember going to Speedway. He remembered passing the Meijer gas station, but then he got confused as to where he was, which was his only clue of low blood sugar. Pearson testified that he did not remember sweating or feeling the need to

use a bathroom. Passing the Meijer gas station was the last thing he remembered until the paramedics got him to the ambulance and got his sugar back up to above 26. He stated that his confusion had "set in very quickly" and "was way worse" than the workplace incident three years earlier, during which he still had "awareness" and "knew what was going on." He had never previously experienced anything like what he experienced on the day of the accident, which he believed was attributable to not consuming enough carbohydrates.

{¶ 21} Pearson was questioned about his medical records, which indicated that in the emergency room, he had stated that he had remembered and felt the impact of his car striking another car. At the deposition, he stated that he did not remember the impact; he assumed that the impact had "kind of startled" him into "knowing that something happened," but he did not have any real memory of it.

{¶ 22} Pearson testified that he had not had any "severe events" in the month prior to the accident after switching insulin pens, but that he had found himself to be hypoglycemic by testing his sugar level. He stated that, around the time of the accident, he occasionally had to eat something between eating lunch and dinner. At the time of the accident, he was taking 24 units of insulin in the morning and 18 at night.

{¶ 23} Pearson stated that his doctor had not offered him an insulin pump prior to the accident; Pearson's father, who was also diabetic, had been trying to get him to use an insulin pump because it was an easier way to control his insulin and blood sugar, but Pearson had been apprehensive because of his level of activity and not wanting to have something hooked to him.

{¶ 24} Pearson testified that he was not sure how long he had been at Meijer the day of the accident, but it was "probably 30 minutes or more." He remembered being inside Meijer, just on the grocery side, as he was getting something for dinner.

{¶ 25} Pearson stated that he was not injured as a result of the accident.

{¶ 26} Appellants responded to the motion for summary judgment on April 22, 2022. They argued that the accident had been caused "by a hypoglycemic event" that had been "entirely foreseeable" and had resulted from Pearson's failure to monitor and control his well-known diabetic condition. They asserted that Pearson was "attempting to expand the sudden emergency defense" to include his known diabetic condition, when it had been well within his control to avoid the accident (and liability) in this case. They also pointed out that he had offered no expert opinion on the issue and had failed to prove that his medical emergency came about suddenly or unexpectedly. Appellants argued that Pearson had admitted prior diabetic " 'events' or 'episodes,' " which meant that the cause the collision had been within his knowledge and control, and he should be held responsible for the accident.

{¶ 27} The trial court granted the motion for summary judgment on April 23, 2022. In that decision, the court incorrectly stated that the Appellants (then Plaintiffs) had not responded to the motion for summary judgment. The court found that Pearson's January 10, 2019 accident "was the only severe hypoglycemic event he ever experienced in which he lost complete awareness of his surroundings," also noting that none of the prior incidents had occurred while driving. The court also stated that Pearson's physician had never advised him to refrain from operating a vehicle. The court found that Pearson had

established the "sudden medical emergency defense" by presenting undisputed evidence that, during the incident, he had experienced "sudden confusion, disorientation and ultimately unconsciousness," which had made it impossible for him to control his vehicle. The court also found that Pearson had established that this hypoglycemic event had not been foreseeable. Based on its belief that the Appellants had not responded to Pearson's summary judgment motion, the court concluded that there was "no contrary evidence upon which this Court could reach any other result."

{¶ 28} On May 4, 2022, Pearson filed a reply in support of his motion for summary judgment.

{¶ 29} On May 21, 2022, the trial court issued an amended order granting summary judgment in order to address Appellants' April 22, 2022 response and Pearson's reply. In that decision, the trial court stated:

> It is clear that Mr. Pearson lost consciousness, as he testified that he lost complete awareness of his surroundings, he was found unconscious in his vehicle following the accident, and [he] needed medical aid to regain consciousness. ***There is no contrary evidence to dispute this.***
>
> Plaintiffs assert that Mr. Pearson has not proved that the medical emergency arose suddenly. They attempt to cast doubt as to the suddenness of the hypoglycemic event by offering a vague timeline of events. Yet, the Plaintiffs never explain how any timeline of the events would change the fact that Mr. Pearson testified as to how suddenly he lost total awareness of his surroundings, with none of the typical warning signs

of low blood sugar. Plaintiffs offer no evidence supporting their argument, relying instead on rank speculation. ***In short, Plaintiffs' arguments fail to establish a genuine issue of material fact.***

***There is no evidence that Mr. Pearson's medical emergency was somehow foreseeable.*** Mr. Pearson had never previously experienced a hypoglycemic event in which he lost complete awareness of his surroundings, and he had never been advised by a physician to refrain from driving.

Plaintiffs' argument, completely devoid of countervailing facts, simply asserts that because Mr. Pearson is a diabetic, his hypoglycemic event was foreseeable. Were the court to accept this premise, which the Court expressly does not, diabetics in Ohio as a class would effectively be prevented from driving.

(Emphasis sic.)

{¶ 30} Appellants appeal from the trial court's judgment. They assert the following assignment of error:

THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF [PEARSON].

{¶ 31} Appellants argue that Pearson could not adequately explain what had happened "for the period of time (at least an hour and a half)" when he "allegedly lost consciousness upon leaving Meijer around 2:00-2:30 pm" until he caused the accident around 3:55. According to Appellants, after "passing the Meijer gas station, and despite

knowing that his blood sugar was dropping," Pearson apparently drove to the Speedway gas station some two miles away. They also point to the fact that Pearson "has taken measures to more easily control his diabetes" since the accident.

{¶ 32} Appellants further argue that the defense of sudden medical emergency generally "is not appropriately decided on summary judgment" because it involves several factual considerations that need to be decided by the jury. They assert that it was "problematic" for the trial court to permit a defendant to establish the defense of sudden medical emergency, as a matter of law, based only on the testimony of the defendant; they also argue that the trial court's decision "expand[ed] the defense" to persons with a known, long-term diabetic condition who "admit their unconsciousness was a result of their own failure to control their known condition." Appellants contend that expert testimony was needed because the factual issues in this case were beyond the ordinary, common, and general knowledge and experience of a layperson and that Pearson's own "conflicting testimony" that he had suffered a sudden and unforeseeable medical emergency was insufficient.

{¶ 33} Appellants argue that Pearson's "own testimony and timeline" revealed that his "period of unconsciousness was anything but sudden." Appellants assert that Pearson "would have this court believe that he was unconsciously operating his car * * * for one to one and [a] half hours" and that, because Pearson cannot state when he lost consciousness, he did not prove that it came about suddenly. They rely on *Ciccarelli v. Miller*, 7th Dist. Mahoning No. 03 MA 60, 2004-Ohio-5123.

{¶ 34} Appellants allege that Pearson's statement to a physician at the emergency

room that he did not remember exactly what had happened but did remember the impact of the accident was inconsistent with his claim of unconsciousness. Appellants assert that medical testimony was needed to "verify the cause and period of unconsciousness" and that the trial court erred in determining, as a matter of law, that Pearson was unconscious at the moment of impact. Therefore, summary judgment was inappropriate.

{¶ 35} Further, Appellants argue that the trial court failed to consider all the evidence when it found that Pearson's unconsciousness was not foreseeable. They point out that Pearson testified to "many prior instances" when his blood sugar had dropped, that he was able to recognize symptoms when it was happening, and that his blood sugar monitoring in the month prior to the accident had revealed hypoglycemia several times. Appellants argue that Pearson had sufficient warning about his condition, knew that it needed monitoring, and knew how to counteract the hypoglycemic episodes.

{¶ 36} Finally, Appellants argue that the trial court erred in granting summary judgment because Pearson failed to prove that it had been impossible to control his car.

{¶ 37} Pearson responds that his diagnosis of "hypoglycemic unawareness" was part of the record and that Appellants mischaracterize the undisputed evidence by suggesting that he drove to the Speedway gas station as "an intentional destination" and consciously turned out of the parking lot. Pearson asserts that the witness statements attached to his motion established that he had been traveling at a high rate of speed, through the parking lot, over curbs, and then into the Appellants' lane of travel, and there was no evidence "that any of this was a conscious act." He argues that Appellants had not presented any Civ.R. 56 evidence to challenge his evidence of his diagnosis, how a

26 blood glucose level might impact a person, or how hypoglycemia had impacted him in the past. According to Pearson, Appellants simply argued that questions about the timeline leading up to the accident created a question of fact to be resolved by the jury.

{¶ 38} Pearson argues that "there can be no reasonable dispute that [he] had a diabetic emergency on January 10, 2019" and that none of the witnesses' observations suggested that he had been conscious. As such, he argues that his consciousness was "not so much a medical issue for which expert testimony [was] required as * * * a statement of fact" to which Appellants offered no "genuine rebuttal."

{¶ 39} Further, Pearson asserts that this case does not involve a "genuine dispute as to whether a 26 mg/dl blood glucose level would render [him] unconscious." Pearson had lived with diabetes for 30 years, which qualified him to testify to basic facts about diabetes and its effect on him, and he testified that "26 mg/dl is well beyond any sort of awareness."

{¶ 40} Pearson asserts there was nothing in his medical history that would have made him believe he would suddenly lose consciousness without warning the day of the accident. He asserts that Appellants failed to create a genuine issue of material fact as to whether he was conscious at the time of the accident or whether his loss of consciousness had been foreseeable. Pearson cites *McCoy v. Murray*, 3d Dist. Defiance No. 4-08-36, 2009-Ohio-1658, and *Cincinnati Ins. Co. v. Allen*, 2d Dist. Clark No. 2007-CA-134, 2008-Ohio-3720, in support of his arguments. He also argues that Appellants' assertion that Pearson continued driving for a significant period when his blood sugar dropped was "speculation" and "a mischaracterization of the evidence," which

was that he "was found clearly unconscious and had to be revived by medical personnel."

{¶ 41} In reply, Appellants reiterate that Pearson did not produce any expert testimony to support his "self-serving statement and self-serving medical diagnosis" that he had suffered a sudden medical emergency. They argue that upholding the trial court's order would expand the sudden medical emergency doctrine and "open the flood gates" to defendants asserting that they don't know what happened and shifting the burden to plaintiffs, which they characterize as "is a blatant distortion of the law." Appellants assert that the trial court's opinion "eviscerates any liability even when the medical emergency is brought about by one's own doing or failure."

{¶ 42} Appellants assert that Pearson did not cite one case where the defense of sudden medical emergency was established without expert testimony, and they argue that Pearson's statements did not even establish the defense, because they did not "speak about the crucial element of suddenness."

{¶ 43} The standard of review for summary judgment as follows:

We review the trial court's ruling on a motion for summary judgment de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, ¶ 42. De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence, without deference to the trial court, to determine whether, as a matter of law, no genuine issues exist for trial. *Ward v. Bond*, 2d Dist. Champaign No. 2015-CA-2, 2015-Ohio-4297, ¶ 8.

Pursuant to Civ.R. 56(C), summary judgment is proper when (1)

there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996); Civ.R. 56(E). Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

*State v. Smith*, 2d Dist. Montgomery No. 28762, 2020-Ohio-4088, ¶ 11-12.

**{¶ 44}** In *McCoy v, Murray,* 3d Dist. Defiance No. 4-08-36, 2009-Ohio-1658*,* which Pearson cites, the Third District noted:

* * * The defense of sudden medical emergency was initially stated in Ohio in *Lehman v. Haynam* (1956), 164 Ohio St. 595, 133 N.E.2d 97, and was subsequently clarified in *Roman v. Estate of Gobbo*, 99 Ohio St.3d 260, 791 N.E.2d 422, 2003-Ohio-3655. The rule articulated by the Ohio Supreme Court is that unconsciousness is a defense against a claim of

negligence as follows:

> an operator of a motor vehicle who, while driving, becomes suddenly stricken by a fainting spell or loses consciousness from an unforeseen cause, and is unable to control the vehicle, is not chargeable with negligence or gross negligence. Stated differently, fainting or momentary loss of consciousness while driving is a complete defense to an action based on negligence (and a fortiori to an action based on gross negligence) if such loss of consciousness was not foreseeable.

*Roman* * * * at 266, * * * quoting *Lehman*, 164 Ohio St. at 599-600, 133 N.E.2d 97. The *Roman* Court also rearticulated that the party asserting the sudden medical emergency defense bears the burden of proof with respect to the defense. *Roman*, * * * at 273, * * * quoting *Lehman*, * * * at paragraph three of syllabus. * * *

* * * In considering foreseeability, the *Roman* Court noted that "the foreseeability inquiry in cases in which a defendant raises the defense of sudden medical emergency frequently amounts to a consideration by the factfinder of whether the defendant driver should have been driving at all." *Roman,* 99 Ohio St.3d at 271-272, 791 N.E.2d 422. To qualify for the defense, the defendant must prove by a preponderance of the evidence that he had no reason to anticipate or foresee the sudden loss of consciousness. *Dunlap v. W.L. Logan Trucking Co.* 161 Ohio App.3d 51, 67, 829 N.E.2d 356, 2005-Ohio-2386 citing *Lehman,* 164 Ohio St. at 600, 133 N.E.2d 97.

Moreover, the *Roman* Court clarified the foreseeability issue as follows:

> an automobile driver who suddenly and quite unexpectedly suffers a heart attack does not become negligent when he loses control of his car and drives it in a manner which would otherwise be unreasonable; but one who knows that he is subject to such attacks may be negligent in driving at all.

*Roman*, 99 Ohio St.3d at 272, 791 N.E.2d 422.

*McCoy* at ¶ 11-15.

{¶ 45} In *McCoy*, defendant Murray had submitted several affidavits, including one by his physician, with whom he had had a relationship for several years. The physician's affidavit stated that, prior to the accident, Murray had not had a history of heart problems or exhibited any symptoms thereof, and that the physician had never advised Murray not to drive a motor vehicle. *Id.* at ¶ 16. The physician opined to a reasonable degree of medical certainty that Murray had lost his vision while driving and had had a fainting episode as a result of cardiac arrhythmia. Murray had also submitted an affidavit stating that he had never been treated for any heart-related conditions. *Id.* In response, the McCoys argued that Murray had been " 'a time bomb' with a long history of high blood pressure, high cholesterol, noncompliance with medication, chest pains, and smoking." They presented the opinion of another doctor who indicated to a reasonable degree of medical certainty that Murray's episode had not been a sudden medical emergency but that it had been foreseeable. *Id.* at ¶ 17.

**{¶ 46}** The Third District determined as follows:

The present case presents a factual scenario very similar to that at issue in *Roman*. In *Roman*, the defendant suffered a fatal heart attack while driving, resulting in his own death and the death of other drivers. The *Roman* defendant had a prior medical history of heart disease, including a prior bypass surgery. *Roman*, 99 Ohio St.3d at 263, 791 N.E.2d 422. However, the defendant, in *Roman*, had not been advised not to drive and his physician had described his condition as stable.

In considering the foreseeability of the defendant's heart attack in *Roman*, the Ohio Supreme Court specifically rejected the argument that "a driver who operates a vehicle with knowledge of any medical condition should bear the risk of injuries that result from loss of consciousness or incapacitation due to the condition. Appellants contend that assumption-of-the-risk principles should apply in a situation where a driver with a medical condition chooses to operate a vehicle." *Roman*, 99 Ohio St.3d at 271, 791 N.E.2d 422. In reviewing that argument, the *Roman* Court concluded that "[i]f we accept this argument, then only those defendants who have never had any inkling of any medical condition would be able to assert and prevail on the sudden-medical-emergency defense, and all other drivers would be precluded from relying on the defense." *Id*.

This Court finds the rationale of the *Roman* Court and the trial court in the present case persuasive. Although one can look at Murray's history

as a smoker with high blood pressure and cholesterol, and a family history of heart disease and determine that he was bound to suffer a heart condition, it would have been impossible to predict how and when such a condition might occur.   Moreover, there was nothing in Murray's history that would lead a reasonable person to believe they were in danger of suffering a loss of consciousness.   While the McCoys make much of Murray's history, nothing indicated a known risk of losing consciousness. *See Cincinnati Ins. Co. v. Allen*, 2nd Dist.   No.2007-CA134, 2008-Ohio-3720 (Defendant with a history of lightheaded spells could not have foreseen that he would experience a total blackout while driving as he had never experienced such an incident in the past).

*McCoy* at ¶ 20-22.   The Third District concluded that "there was no genuine issue of material fact with regards to the unforeseeable nature of Murray's unconsciousness" and affirmed the grant of summary judgment in his favor.   *Id.* at ¶ 23.

{¶ 47} *Ciccarelli v. Miller*, 7th Dist. Mahoning No. 03 MA 60, 2004-Ohio-5123, cited by Appellants, involved a diabetic emergency, and the Seventh District reversed the grant of summary judgment in favor of the diabetic defendant, Miller.   The following was significant to the Seventh District:

* * * Miller presented expert testimony from Dr. Wise that she had suffered an unforeseen blackout.   It is clear, though, that Dr. Wise had no way of knowing when the blackout allegedly occurred, and whether it occurred before or after Miller's act of pressing the accelerator while her car

was still in reverse.   The only person who could testify about this was Miller, and her deposition testimony only reveals that she did not remember what happened. (Miller Depo., p. 88.)   There are some indications in Miller's deposition that she may have left skid marks, which would tend to show that she was conscious enough to hit the brakes.   (Miller Depo., pp. 85-86.)   It is also clear that Miller hit her head during the collision, which could help to explain how and when she became unconscious. (Miller Depo., p. 10.)   It is difficult to comprehend how this type of contradictory evidence could be the basis for granting summary judgment in Miller's favor.

In addition, there are some credibility problems that arise from Miller's evidence.   First, Miller relies heavily on the unrebutted expert opinion of Dr. Wise, who began treating Miller for diabetes in November 1999.   This was only five months before the automobile accident.   Miller stresses the importance of Dr. Wise's unrebutted affidavit which asserts that she had a "syncopal episode and lost consciousness," on the day of the accident, and that there was no reason to foresee that this would happen. A "syncopal episode" is simply another way of saying "loss of consciousness."   Dr. Wise submitted this affidavit before he knew that Miller had been in a diabetic coma for eight days approximately 13 years before the automobile accident.   (Wise Depo., p. 10.)   Miller never shared this information with Dr. Wise and he eventually learned about it from other sources. (Wise Depo., p. 10.)

According to Miller, the coma came on very suddenly. (Miller Depo., p. 28.)   In contrast, Dr. Wise testified that the information he received from Miller was that she had never had an incident where she suddenly blacked out. (Wise Depo., p. 11.)   A sudden diabetic coma that lasts for eight days certainly seems like something an expert witness would need to know about prior to giving an expert opinion.   Miller may have been less than completely forthcoming with Dr. Wise.

Miller also failed to tell Dr. Wise that she was having regular dizzy spells in the few months prior to the accident. (Wise Depo., p. 71.) Although Dr. Wise only treated Miller twice for dizziness prior to the accident, he learned from another source that she regularly complained of dizziness. (Wise Depo., pp. 16, 39, 71.)

Based on the analysis in *Lehman*, and based on the credibility issues surrounding Miller's evidence, the trial court should not have granted summary judgment in favor of Miller.

The additional cases Wheeler cites in his brief reinforce the principles outlined above.   In *Castle v. Seelig* (July 9, 1993), Sixth Dist. No. H-92-059, the trial court granted summary judgment to two separate defendants based on the "sudden loss of consciousness defense."   The Sixth District Court of Appeals reversed the trial court based on *Lehman. Id.* at 9-10, 133 N.E.2d 97.   The Sixth District noted that the defendants established some evidence to prove that they blacked out and that the blackout was not

foreseeable. *Id.* at 10-11, 133 N.E.2d 97. Nevertheless, the appellate court found that there were credibility issues with the defendants' testimony about when and if they blacked out, and found it significant that one of the defendants had suffered a head injury during the accident. *Id.* at 11, 133 N.E.2d 97. Although Appellee would like to distinguish the facts of *Castle* from those of the instant case, the two cases appear to be quite similar.

{¶ 48} Regarding the foreseeability of Miller's blackout, Ciccarelli noted:

* * * The main evidence showing that Miller could have foreseen a blackout consists of: 1) the diabetic coma that occurred thirteen years prior to the accident; 2) repeated cases of dizziness in the few months prior to the accident; 3) Miller's report of dizziness just days prior to the accident (Wise Depo., p. 39); 4) the fact that Miller had some type of viral infection requiring antibiotics just three days prior to the accident; 5) Miller's surgery just three days prior to the accident, for which she was taking painkillers; 6) the multiple drugs that Miller was taking, including anti-depressants and pain killers, that could cause dizziness, lightheadedness and loss of motor functions (Wise Depo., p. 38); and 7) Miller's refusal to follow the dietary plans essential to controlling her diabetes, leading to possible consequences of very high or very low blood sugar, including blackouts and coma (Wise Depo., pp. 11, 12, 15, 19, 24, 25, 27).

Although Dr. Wise did not recall ever telling Miller that she should avoid operating a motor vehicle, it might be possible for a jury to decide that

a person who has diabetes, is constantly dizzy, has the flu, has just had surgery, is taking painkillers and anti-depressants, is not controlling her diabetes, and has suffered a diabetic coma, should be aware of the risk of blacking out. Looking at all this evidence in a light most favorable to Appellants, it is possible that a jury could conclude that Miller should have foreseen some type of problem similar to the blackout that allegedly occurred on April 20, 2000. * * *

*Id.* at ¶ 48-49.

{¶ 49} In *Cincinnati Ins. Co. v. Allen*, 2d Dist. Clark No. 2007-CA-134, 2008-Ohio-3720, James Allen became lightheaded and nauseous while stopped at a red light,. A minute after proceeding on the subsequent green light, he became unconscious, damaging the property of a church. *Id.* at ¶ 3. Allen moved for summary judgment, asserting that he had suffered a sudden unexpected medical emergency, and the trial court granted the motion. On appeal, Appellants, the church and Cincinnati Insurance Co., asserted that the court had erred in failing to strike portions of Allen's affidavit.[1] *Id.* at ¶ 8. Specifically, they argued that the trial court improperly had allowed the medical diagnosis to remain in paragraph five of Allen's affidavit and that Allen should not have been allowed to testify to the legal conclusion that he suffered a "sudden medical emergency." *Id.* at ¶ 15. In paragraph five, Allen stated: "At no time before the sudden medical emergency * * * had I ever received treatment for, or been diagnosed with, sick

---

[1] The trial court had already struck paragraph 4 of the affidavit, which provided: "I was taken by ambulance to Community Hospital where I was diagnosed with syncopal episode secondary to sick sinus syndrome."

sinus syndrome or syncopal episodes secondary to sick sinus syndrome."

{¶ 50} This Court determined:

Although Allen testified to suffering a "sudden medical emergency," that phrase is not a legal term of art. Allen's affidavit can reasonably be interpreted as stating that he suffered a sudden onset of a medical problem, which is admissible. In addition, we find no error in the trial court's denial of the motion to strike paragraph five of Allen's affidavit. Unlike paragraph four, Allen's statement that he had not previously been diagnosed with sick sinus syndrome or syncopal episodes secondary to sick sinus syndrome is not hearsay. Regardless, the issue is not whether Allen was aware of a diagnosis for his medical condition, but whether he knew he had a medical condition that might cause him to lose consciousness. *See Dunlap v. W.L. Logan Trucking Co.*, 161 Ohio App.3d 51, 2005-Ohio-2386, 829 N.E.2d 356, ¶ 51.[2] The statement in paragraph five that Allen had not previously been diagnosed with a particular medical condition—particularly in the absence of paragraph four—is not probative of whether the unconsciousness was foreseeable. Although the trial court may have elected to strike this paragraph, we find no abuse of discretion in the trial court's failure to strike additional portions of Allen's affidavit.

---

[2] *Dunlap* held that, "* * * despite the fact that [employee-driver] Munnal's sleep apnea was not specifically diagnosed until after the accident, Munnal was aware of excess fatigue and aware of falling asleep at inopportune or unusual moments prior to the accident. Thus, the court did not err in concluding that Munnal failed to prove by a preponderance of the evidence that his loss of consciousness was not foreseeable, and so Munnal did not qualify for the sudden-medical-emergency defense."

(Footnote added.) *Id.* at ¶ 16.

**{¶ 51}** Appellants in *Allen* further argued that summary judgment was inappropriate because "genuine issues of material fact existed as to whether Allen could have foreseen the occurrence of the blackout." *Id.* at ¶ 31. They asserted that the sudden medical emergency defense was "not appropriately resolved by summary judgment." *Id.* at ¶ 34. In response, we stated:

> * * * [T]he Supreme Court has stated that "many cases in which sudden medical emergency is raised as a defense to negligence are not well suited to resolution by summary judgments or directed verdicts, but must proceed to trial, where it is incumbent upon the factfinder to determine whether the requirements of the defense have been met." *Roman*, 99 Ohio St.3d at 273, 791 N.E.2d 422.
>
> While the Supreme Court noted that the first element of the defense—whether the driver was unconscious—often involves a credibility determination that cannot be resolved through summary judgment, the Supreme Court has not stated that all cases must be resolved by a trial. To conclude that summary judgment is per se unreasonable whenever the sudden medical emergency defense is raised would abdicate our responsibility to resolve the issue on a case's individual merits.

*Id.* at ¶ 34-35.

**{¶ 52}** Further, we observed:

* * * At the time of the accident, Allen had been experiencing

lightheadedness for approximately eleven years. There was no evidence that Allen had ever lost consciousness due to the lightheadedness prior to the September 2004 accident, and he stated that he had not previously— and has not since—felt symptoms as severe. Although Allen indicated that he usually stopped what he was doing until the lightheadedness passed, Allen further indicated that the lightheadedness passed whether he stopped or not, without becoming more severe. Based on this undisputed evidence, which is buttressed by Dr. Ericksen's opinion that Allen's loss of consciousness was not foreseeable, the trial court did not err in finding no genuine issue of fact that Allen could not have reasonably anticipated blacking out on September 11, 2004.

*Id.* at ¶ 43.

**{¶ 53}** Herein, regarding Pearson's loss of consciousness, he averred in his affidavit that on January 10, 2019, he had "suffered a diabetic emergency that led to an automobile accident," and he testified at deposition that he had been rendered unconscious and "lost awareness." Pearson further testified that driving past the gas station was the last memory he had until the paramedics had him in the ambulance and "got [his] sugar back up above 26." Pearson's testimony was not the only evidence that he suddenly lost consciousness. Rick Demis observed the accident and averred that Pearson had been unconscious when he checked on him after the crash. Pearson testified, in response to questions from Appellants about his medical records, that the record reflected "hypoglycemia unawareness" and a blood glucose of 26 milligrams at the

time of the accident. While Appellants argue that the diagnosis was inadmissible hearsay, Appellants had elicited this testimony (and thus had not objected to it), which differed from the situation in *Allen.* Appellants offered no Civ.R. 56 evidence to rebut Pearson's evidence that he had been unconscious at the time of the accident.

{¶ 54} Also, unlike in *Ciccarelli,* there was no evidence that Pearson was conscious at the time of the accident, such as skid marks indicating that he had applied the brakes, and there was also no evidence that Pearson had sustained a head injury during the accident which might explain how he became unconscious. While Appellants suggest that Pearson was awake at the time of the impact, they offered no evidence in support of this speculation. Accordingly, Appellants failed to establish the existence of a genuine issue of material fact as to whether Pearson had been unconscious.

{¶ 55} Regarding the suddenness of the onset of Pearson's lack of consciousness, Appellants mischaracterize the record when they assert that Pearson's timeline was "vague, ambiguous," and did not explain how he suddenly lost consciousness. Appellants assert that Pearson was "unconsciously operating his car and/or doing whatever else for one to one and a half hours." This assertion was speculative, and we agree with the trial court that Appellants failed to explain how any discrepancies or ambiguities in the timeline of the events had any bearing on Pearson's testimony that he "suddenly lost total awareness of his surroundings, with none of the typical warning signs of low blood sugar." Pearson provided competent summary judgment evidence that he had experienced confusion, suddenly lost consciousness, drove erratically, and crashed head on into the vehicle driven by Norman.

{¶ 56} Regarding foreseeability, Pearson met his Civ.R. 56 burden on this issue, and Appellants failed in their reciprocal burden. Pearson averred that he had been under the regular care of a physician to manage his diabetes, had never been advised by any medical provider not to drive or to take additional precautions while driving, and had never had an accident attributable to his diabetes diagnosis. As in *McCoy*, 3d Dist. Defiance No. 4-08-36, 2009-Ohio-1658, the trial court reasonably concluded that, considering Pearson's 30-year history of diabetes, including his seven severe events in all those years, it would have nevertheless been impossible to predict that the accident on January 10, 2019, would occur. Pearson testified that, although he had experienced confusion in prior episodes, he had never previously lost consciousness. He also testified that, on this occasion, his confusion set in very quickly while driving, and that he had not experienced other common symptoms, such as sweating and an urge to use the bathroom. Pearson testified that the accident was the "worst day" of his diabetic history, and that it was much worse than the second-worse episode (at work), during which he had remained aware of his surroundings. He also stated that there had not been a severe event between the workplace event three years prior and the accident.

{¶ 57} Importantly, there were no credibility issues surrounding Pearson's evidence, as in *Ciccarelli* (defendant's prior*,* sudden diabetic coma for eight days and regular complaints of dizziness prior to the accident). Pearson voluntarily testified to isolated incidents of severe hypoglycemic events, which he remembered. Further, in *Ciccarelli*, the Seventh District listed seven reasons Miller could have foreseen a blackout, including that she had refused "to follow the dietary plans essential to controlling her

diabetes," increasing the possibility of very high or very low blood sugar, including blackouts and coma. Pearson's testimony reflected that he had followed a routine in managing his diabetes and was cautious about his condition, checking his blood sugar levels up to five times a day. We agree with the trial court that, if the court accepted the premise that Pearson's hypoglycemic event was foreseeable, then "diabetics in Ohio as a class would effectively be prevented from driving." This is not the same as holding that a defendant's simple claim of "I don't know what happened" will establish the defense of sudden medical emergency, as Appellants claim.

{¶ 58} Regarding Appellants' assertion that Pearson had failed to establish that he was unable to control his car in the course of his medical emergency, we note that Black's Law Dictionary defines an emergency as a "sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm," or an "urgent need for relief or help." *Black's Law Dictionary* 660 (11th Ed. 2019). Pearson testified that he had no memory of driving into Appellant's vehicle. Ashley Davis observed his vehicle "fly like a bat out of hell from Speedway," "hit the curb," and swerve at a high rate of speed, almost hitting a van before drifting into the opposite lane and hitting Appellants' vehicle head on. Demis also observed Pearson hit the curb and turn into oncoming traffic before hitting Appellants' vehicle. Appellants provided no Civ.R. 56 evidence establishing a genuine issue for trial regarding Pearson's inability to control his vehicle.

{¶ 59} While it is true that there was no expert testimony offered in support of "establishing any element of the defense" of sudden medical emergency, "sudden

medical emergency" is not a term of art, and on this record, given Pearson's history of diabetes, no expert testimony was required to establish the cause of his lack of consciousness. The lack of expert testimony did not create a genuine issue of material fact as to any element of the defense, and the trial court did not err in rendering summary judgment in the absence of an expert opinion.

{¶ 60} Finally, Appellant's argue that the defense of sudden medical emergency is not appropriately resolved on summary judgment. As noted in *Allen*, 2d Dist. Clark No. 2007-CA-134, 2008-Ohio-3720, "the Ohio Supreme Court has not stated that all [such] cases must be resolved by a trial." Construing all the evidence in a light most favorable to Appellants, and in the absence of a genuine issue of material fact, Pearson was entitled to summary judgment as a matter of law. Accordingly, Appellants' assignment of error is overruled.

{¶ 61} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J., and LEWIS, J. concur.


Copies To:

Robert B. Acciani
Brian L. Wildermuth
Tabitha D. Justice
Hon. Steven K. Dankof